**Pamela Ruth McGoldrick FIELDER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 283–85.**

Court of Criminal Appeals of Texas.

June 8, 1988.

Stanley G. Schneider, Michael J. Hinton, Houston, for appellant.

Tim Curry, Dist. Atty., and C. Chris Marshall, David K. Chapman and Joe Lockhart, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

MILLER, Judge.

Appellant's conviction for voluntary manslaughter is before us on her petition for discretionary review. She was convicted by a jury which assessed her punishment at two years confinement. The Fort Worth Court of Appeals affirmed in a published opinion. *Fielder v. State*, 683 S.W.2d 565 (Tex.App.—Ft. Worth 1985).

The evidence established that appellant shot her husband of three years on the evening of July 23, 1981, firing seven rounds into his body with a .45 semi-automatic pistol. The trial court instructed the

jury upon the law of murder, self defense and voluntary manslaughter.

Appellant's theory of the case was that she had suffered physical and sexual abuse at the hands of her obstetrician-gynecologist husband, Darwin Fielder, with increasing severity throughout the course of their marriage. According to appellant, she had initially consented to "playful" "bondage and discipline" games with her husband. These games, however, eventually crossed into the realm of what would clearly be, to the average person, a nightmare of sadomasochism. For example, Darwin would administer a substance he told her was demerol in order to force her to participate in such activities as piercing her genitals with a golden ring and nailing his own scrotum to wooden blocks while sitting before her as she hung nude, shackled and tied to metal rings in a closet Darwin had customized for such activities. This closet was called "the cave" by the Fielders. Appellant testified that, in addition to the sado-masochistic sexual abuse Darwin heaped upon her toward the end of the marriage, he became physically violent when the couple argued. Appellant claimed that in the heat of violence, Darwin would tell her, "If you ever tell anyone, I'll kill you."

Appellant claimed that these incidences of violence were not frequent and that, in between them, she and Darwin had a normal, satisfying marriage, each pursuing his own successful career and socializing with the country club set. She testified that after the violent episodes, Darwin would be very contrite and beg her forgiveness, acknowledging he was afflicted with an extreme sickness, assuring her he was motivated to be cured. The couple would then enter a period of normalcy.

Appellant testified it was Darwin's greatest fear that his sexual proclivities would be exposed. Once, when she entered "the cave" and hid some of Darwin's "toys",[1] he beat her and threatened to kill her if she ever told anyone of their activities. When appellant threatened to leave Darwin, he would laugh at her and tell her there was no place she could go and no place she could hide where he could not find her. Appellant testified she was terrified of Darwin when he was in this frame of mind, and she believed that she could not escape him.

However, according to appellant, by the spring of 1981, things had degenerated to the point that she could no longer endure these episodes—which lasted up to six or seven hours—however infrequent. The final "straw" came when Darwin fashioned a "potty chair" which was to fit over the neck and shoulders of one person whose face was exposed to the opening. Appellant testified she unequivocally refused to participate in activities with the "potty chair", and ultimately the couple agreed they would divorce. Darwin, however, had a time table and plan for their separation and divorce and he would tolerate no deviation; in order to assure appellant did not expose his sexual preferences to a lawyer, he insisted she agree to involving only one lawyer, and to seeing that lawyer only in his presence after they separated.

By July 22, 1981, Darwin Fielder had rented a townhouse and was planning to move into it the following week. On that morning, appellant had driven to consult an attorney in Dallas about divorcing Darwin. She had gotten lawyer Bob Davis' name from her sister who she had told, "My life has turned into a sewer". According to appellant, Davis had advised her to go into "the cave" in Darwin's absence, package all his "toys", and bring them to his office. This was for her protection. When appellant arrived home, she filled five large black garbage bags with Darwin's "toys".

Appellant claimed she was so seized with terror at the thought Darwin would discover what she had done, that she went to a pay phone to report to Davis that the

---

**1.** When the defense reached Defense Exhibit No. 108, the trial court ruled no more of these "toys" would be admitted absent a showing of the relevance that was not cumulative. Up to the point some of the "toys" admitted before the jury were described as "black leather hood", "handcuffs", "shackles", "bullwhip", "crop", "gag", "leather straps", "metal rings", "pinchers", "bull rings for the nose of a bull", "discipline helmet", "collar", to name only a few.

packaging was complete, rather than put the five garbage bags in her Seville and drive them to Dallas. After making the call, she left the packaged "toys" in the "cave", re-locked the door and went about her day. That evening, she and Darwin went to his townhouse to discuss the arrangement of furniture. The next day appellant and Darwin went their respective ways. Darwin called her in the afternoon, and, according to appellant, they made plans to meet later, either at the club for dinner, or if appellant missed the dinner hour due to a late appointment she had scheduled, at his townhouse.

After her 7:00 p.m. appointment, appellant did not find Darwin at the Shady Oaks Club, so she went to his townhouse. She rang the bell, but there was no response; the door was ajar, so she pushed it open and walked in. Darwin was standing in the doorway of the living room which connected to the garage, and he motioned her in to the garage. Appellant observed a sleeping bag on the floor in front of the fireplace in the otherwise empty apartment, and soft music was coming from a radio. Walking into the garage, appellant saw Kim Kelly, Darwin's office manager and nurse, standing in a corner of the garage. Darwin's and Kim's cars were in the garage with the gargae door shut. Appellant and Kim exchanged some words; appellant then said to Darwin, "Why didn't you just tell me about [your relationship with Kim]?" Darwin said he was going to come home to discuss the matter, and appellant asked him, "what time?", in a "snippy tone". Darwin replied, "Well, if you're going to be like that, then I'm not coming home", to which, according to appellant, she replied, "fine", and left.

Appellant testified she arrived home at about 9:30 p.m. She made herself a drink and sat down in the den. Soon, appellant heard Darwin come in. He walked into the den and put a glass filled with ice on the bar next to where appellant was sitting and ordered her to "fix [him] a drink." Appellant replied, "fix it yourself." Darwin grabbed appellant's foot, pulled her and the chair she was in around a quarter turn and said "fix me a drink."

Darwin told appellant, "I love Kim and she loves me and now you can see that I don't need you." Appellant said something to the effect of, "Well, I went to see an attorney in Dallas yesterday." Darwin was "furious. He was very angry, instantly." According to appellant, "It was the look on his face and—And he banged his stuff on the table and flew into ["the cave"], and I knew where he was going.... I was terrified, and I waited until he got around the second door, and I ran for the back door that goes out of the living room."

Appellant testified she was running outside when Darwin grabbed her by the arm and by her hair and pulled her back inside, twisting her arm behind her and pushing her in front of him. Back inside, Darwin pushed her hard to the floor in front of the table. The whole time Darwin was screaming, "I've told you; I've told you", and he went straight to a cabinet above the bar, opened it and pulled out appellant's pistol. Appellant told the court, "I knew [this meant] he was going to kill me."

Appellant quickly got up on her feet and went over to the bar; she began pouring bourbon into Darwin's glass. Darwin was swearing at appellant and screaming, "What did you tell him? What did you tell him?" Appellant testified everything was happening very fast. Darwin sat down on the edge of a chair and "banged" the gun down so it was still pointed at her; appellant walked to the table and "banged" Darwin's drink down next to the pistol; she grabbed the weapon and started backing away from Darwin, saying "Leave me alone." Darwin came up at her and "the gun went off", though appellant testified she did not remember hearing it. Darwin's hands came around appellant's hands. Appellant could not remember how many times the semi-automatic pistol fired.

Appellant told the jury she grabbed the .45 "because I had to make him leave me alone. And I knew—I knew if I didn't get away that he would kill me. I knew it." Appellant knew Darwin was so afraid of being exposed and having his business

and his life ruined, that he would kill her for what she had done by talking to a lawyer, then packaging his "toys".

Appellant called her mother, then called the police. She could not remember what she had said during her call to the police, but a tape recording revealed she said, "I killed my husband. I need help."

The State's theory of the case was that when appellant found Darwin with Kim Kelly and he later told her he did not need her anymore, appellant killed him—not out of fear of him, but—in a jealous rage. The State's entire case was devoted to depicting appellant's version of the facts and of her role in her marriage to Darwin as implausible.

On cross-examination of appellant, the prosecutor attempted to have her admit that, contrary to her direct testimony, she had full knowledge of Darwin's sexual proclivities prior to their marriage, that she did not make any real attempts to resist the sexual activity, and that she was not really repelled by the "simulated" activity depicted in Darwin's sado-masochistic pornography. Appellant admitted she loved Darwin "very much" when she married him. When asked whether she loved him when she decided that she was going to have to divorce him, appellant replied, "I think I did, but I was—I was so debilitated by everything that had gone on, I—didn't have very much emotion left, so I don't know what was left, at that point".

Q: So you don't know whether you loved him in July of 1981 when you shot him, then?

A: Oh, I'm sure that I did. But there's a difference of loving someone that you can live with and loving someone that you can't live with.

Q: And you decided, in the end of May or the first of June, 1981, that you could no longer live with Darwin Fielder; is that correct?

A: Yes.

Q: But you did, didn't you?

A: Yes, I did.

Q: You stayed in the home and Darwin Fielder stayed in the home through the month of June?

A: Yes, we did.

Q: And you stayed in the home and Darwin Fielder stayed in the home until his death on the 23rd of July, 1981, did you not?

A: Yes.

Q: As a matter of fact, he was—His lease was to begin on the first of August, 1981; is that correct? * * * you knew he was going to move out, didn't you?

A: I knew he was moving out on Tuesday, but I don't know what date that is.

Q: About the 28th of July, 1981?

A: Yes.

The prosecutor then questioned appellant about her sudden and first time consultation with a divorce attorney when her husband's move was imminent and in spite of her agreement not to do so. The suggestion was that appellant was primarily concerned about her financial interests. Appellant admitted one of the reasons she decided to consult an attorney was for financial advice.

Q: And one of the reasons that you bagged up the sex toys was to protect your financial interests, was it not, yes or no?

A: No.

Q: It was not?

A: No.

Q: Were you bagging them up to keep them for your own purposes?

A: No.

Q: Were you bagging them up for use at trial?

A: No, I don't think Bob [divorce attorney] would have done that. He just wanted to protect me. * * * He said he just wanted to protect me. I was very frightened and he felt that that would be protection for me; that I wouldn't have to worry.

Q: Okay. Ms. Fielder, would you tell the jury how it would protect you to do the very thing that you tell this jury you were most afraid of?

A: Because as I've told you, I wasn't thinking clearly. I was very, very debilitated—

\* \* \* \* \* \*

Q: [Did] you believe that Dr. Fielder would be angry if you removed his sex toys?

A: Yes.

On re-direct examination, appellant further detailed her reasons for fearing Darwin: he would threaten her with stories of things he had done to other women, such as have his friends dress as physicians, introduce them to patients as such and have them view the private parts of women in position for gynecological examinations; he claimed to have performed an unnecessary vulvectomy on a patient; when appellant refused to comply with his sexual requests, he would hurt her physically and one day he left her hanging in "the cave" all day long, unclothed with her wrists shackled.

Defense counsel referred to the fact that appellant had never told any attorney about Darwin's sexual perversions before she spoke with Bob Davis the day before the homicide,[2] and then asked appellant:

Q: During that period of time that you were married to Darwin Fielder, why didn't you—why didn't you leave after an episode where any of these items figured into the relationship?

A: Darwin told me that he would severely punish me. He told me, on occasions, he would kill me. He told me that there wasn't anything or any place on this earth that I could ever get away so that he wouldn't be able to find me. And I believed him.

Appellant testified she had every reason to believe Darwin would and could punish her, that he enjoyed inflicting pain on others.

On re-cross-examination, the prosecutor asked appellant, "Well, weren't you mad that you loved Dr. Fielder as you testified to, and that he put you through these things and that you—didn't that make you angry?" Appellant insisted the things Darwin put her through frightened her.

Q: Well, tell me, did you not leave Darwin Fielder because you were afraid he would search to the ends of the world and find you as you testified, or that—because you loved him, which one was it?

A: If it came down to a choice between the two, I didn't leave him because I was frightened.

Q: Okay. And you were afraid is why you didn't leave him; is that right?

A: That's right.

Q: What changed in the spring of 1981 that led you to believe that now you could leave him whereas prior to that time you were afraid to leave him, for your life?

A: Because he finally agreed [to a divorce].

\* \* \* \* \* \*

Q: But you still didn't leave him?

A: I was waiting. He was going to move out, and I was just waiting.

\* \* \* \* \* \*

Q: You could have left that night, couldn't you?

A: No, I could not.

Q: You said you—he [had] said you could leave [previously]. The idea was that you would leave?

A: The idea was that everything was very methodically planned by Darwin, and those plans would be followed.

Q: Isn't it true, Ms. Fielder, that many of these toys or magazines depicted items that are female in nature?

A: Yes, they do.

---

**2.** This was a specific reference to an incident appellant had related in her direct testimony. One night Darwin had thrown a glass ash tray at her; it hit the wall and broke, cutting appellant on the cheek. She had gone next door to the home of her neighbor, who was an attorney. The neighbor advised her to let him photograph the injury. The photographs were admitted as defense exhibits. On cross-examination, the prosecutor had questioned appellant about whether she informed her neighbor about the sexual abuse she was subjected to at home.

Q: And they are to give pleasure to the female participant as well as to the male participant?

A: The ones in the magazines, yes.

Q: But nothing in your home?

A: Pardon me?

Q: Nothing in your home was so designed?

A: I didn't find them pleasurable, no. Many times Darwin had to give me shots.

Q: Were these shots such that you didn't remember the activities the next morning?

A: No, I remembered.

Q: And when you ... left home and went to the office, you were still aware of the fact, were you not, that Dr. Fielder had broken his promise to you never to do these things again?

A: He would always promise.

Q: This went on for a year?

Q: Or more.

Q: More than a year?

A: Or more.

Q: Isn't it true, Ms. Fielder, that you felt that you had done everything that Dr. Fielder had asked you to do?

A: Except seeing the attorney.

Q: And isn't it true you felt betrayed when you found that he had taken a lover, despite what you had gone through?

A: No, Mr. Worley, that is not true.

Q: And isn't it true that you decided if you couldn't have him, nobody was going to have him?

A: No, that is not true.

Q: And isn't that when you decided, and you took your gun and put seven bullets in his body?

A: No.

Q: Didn't happen that way?

A: No, that is not the way it happened.

After the defense presented reputation witnesses, marriage and family counselor, Beatrice Matheeney, Ph.D., was called. Dr. Matheeney testified that her field—psychology—is the study of behavior, motivation, mental illness, physiological functioning, sensation and perception, how individuals react in various situations, "all aspect of human behavior". Dr. Matheeney explained her professional relationship with Women's Haven, a shelter for battered women, and her private work with women who have been abused physically and emotionally. After Dr. Matheeney confirmed the recognized authoritative work in the field of psychiatry is the Diagnostic Survey Manual III (DSM III), she was asked whether that manual makes "any reference to the subject matter known as sadism or sadomasochistic—or sadomasochism", whereupon a State's objection was lodged.

Defense counsel explained the question was designed to elicit the witness' familiarity with "S & M" and "B & D", terms which had been mentioned in the trial; the purpose of this was, in turn, to lay a predicate for a hypothetical question which would embrace facts that were in evidence.

The trial judge asked, "To what end would the hypothetical question be?" Defense counsel replied the question would be as to why a woman who had endured or experienced "the hypothetical facts" would stay or remain in a marital relationship where that sort of conduct went on, assuming it was true. Defense counsel argued the issue had been joined by the State's cross-examination of the accused. After reviewing authorities cited by counsel, the trial court ruled the State's objection was "well taken" [3] and advised defense counsel to proceed with his bill of exception.

After establishing her experience with "women who have been abused" by husbands, boyfriends or lovers, Dr. Matheeney testified a natural question arises in the minds of those "sitting in a comfortable

3. The State's objection—which the record clearly shows was made to Dr. Matheeney's testimony regarding the DSM III definition of "sadomasochism"—was: (1) that the testimony was not relevant "to this Court"; (2) that it had not been demonstrated to be of help to the trier of fact; and, (3) that it was solely "prejudicial to sit up here and talk about people with certain practices", presumably prejudicial to the State.

marriage without having to deal with abuse" as to why such women stay in abusive situations. According to the witness, there are "many, many" reasons for this which are recognized by the mental health profession; it is only after working with abused women that one can understand the situation. Defense counsel then posed a hypothet which comprehended the essential facts as related by appellant in her direct testimony regarding her relationship with Darwin, and concluded, "Could you tell me, on the basis of your experience, your academic training and your studies, if you would have an opinion as to why a woman who did not like such practices would continue to stay or remain with such a physician-husband?" The witness stated she did have an opinion. Dr. Matheeney then detailed several reasons.[4]

She concluded by explaining that it is a recognized phenomenon in the profession that most people have a tendency to believe they personally would not endure such a situation; that all the average person can see is that the abused woman returns to her abuser without really understanding her reasons; that lay people who have not experienced abuse do not really have any frame of reference to fully understand why

a woman would stay with a man who abused her in the fashion outlined in the hypothetical; that family violence "has been a very well-kept secret in our society because of the views that our culture has had in the past of a woman belonging to a man and a man having the right to beat a woman. With women sometimes supporting that view and with the idea that women are afraid to tell friends or to tell someone else that they are being battered ... [it] has been kept a secret." Dr. Matheeney agreed that the kind of perverse sexual abuse detailed in the hypothet would be far more difficult to disclose than beatings or other strictly physical abuse and that the use of bizarre sexual devices would "very definitely" add to the shame of a woman abused by their use.

The trial judge replied that he was still of the opinion that "to permit [the opinion based on the hypothetical question] to be presented to the jury would be an invasion of the province of the jury in their fact-finding process." The trial judge also refused to allow Dr. Matheeney to define the terms "S & M" and "B & D" for the jury, but defense counsel was permitted to make a bill of exception on this as well.[5]

4. Without elaboration, some of the reasons were described as: love and the desire to stay with a particular person is a "powerful" force; the desire to help the mate with his "problem"; fear of being judged as a failure in marriage; desire not to ruin his career; fear of admitting to the abuse; withdrawal from society because of inability to discuss sexual abuse with friends or family which creates helplessness and results in having no "support system that people need in times of stress and trauma", which in turn results in inability to make decisions; fear of reprisal against herself and family; self-esteem is so diminished that the woman doubts her own judgment which "takes [her] down further and further"; the spouse is loving, tender and penitent in between abusive episodes which creates a tendency to "forgive and forget"; all the other reasons for wanting to keep a marriage together create a strong tendency for hope; deteriorated self esteem because she knows what is happening to her is demeaning, yet she feels unable to do anything about it, resulting in her thinking less and less of herself; depression which causes inability to interact and withdrawal which exacerbates depression; depression causes her to be more passive about her situation and she allows the environment to act upon her; if he is programming her for child-like

behavior, reinforcing it, it tends to bring it out; if a woman can make her own living, she has an advantage, but this still does not affect the emotional aspect on an interpersonal level because she still feels the shame and cannot make decisions; that higher socio-economic status of the couple would probably deter the wife even more from revealing sexual or physical abuse because of how devastating she perceives public disclosure would be.

5. According to the witness, the essential feature of "sexual sadism" is "the [infliction] of physical or psychological suffering on another person in order to achieve sexual excitement. * * * The condition is usually chronic in its extreme form. When sexual sadism is practiced with a nonconsenting partner, the activity is likely to be repeated until the individual is apprehended. Some individuals with the disorder remain for many years engaged in sadistic acts without the need to increase the potential for inflicting serious physical damage. Others, however, either because of an increased need or a diminished capacity for restraint, increase the severity of the sadistic acts over time or during periods of stress. *When the disorder is severe, these individuals may rape, torture, or kill their victims."* (emphasis supplied).

On cross-examination of Dr. Matheeney, the State established the witness did not know appellant prior to July 23, 1981, and that she never knew Darwin Fielder. On re-direct examination, Dr. Matheeney testified it was unnecessary for her to personally know a patient in order to form a professional opinion based upon hypothetical facts; she stated she had, in the past, given such opinions as a court appointed expert. After reurging that the testimony be admitted before the jury, defense counsel rested his case-in-chief.

In rebuttal, the State called three witnesses who testified that on the night of the homicide, appellant was hysterical and had said she had "shot him once"; appellant then said something to the effect that Darwin was "hurting and crying" and she loved him so much she did not want him to hurt anymore, so she shot him "until he quit hurting". A family friend, Ed Yeary, testified that appellant had confided to him in June of 1981 that her real estate business was not going well; she reportedly told Yeary that no matter how bad things got, there were always three possible solutions: mental commitment, suicide and homicide. Appellant told Yeary she and Darwin were going to separate. Later, just two days before Darwin's death, appellant told Yeary during a telephone conversation that she had done her best to comply with Darwin's conditions of separation, but that she was going to do everything in her power to save their marriage. Kim Kelly testified Darwin was not expecting appellant at the townhouse on the evening of his death; Darwin had told appellant he had a patient in labor and did not know when he would be home; that when appellant arrived at the townhouse, Darwin kept asking her to "please leave", saying "you were not invited".

After the State rested, appellant, in rebuttal, offered the testimony of Anson Shupe, Ph.D., Associate Professor of Sociology and Associate Director of the University of Texas at Arlington's Center for Social Research. Dr. Shupe testified he had accumulated data since 1980 from 542 cases of family violence which specifically involved battered wives. The State immediately objected to any "statistical analysis [on] what may have been battered wives, on the same grounds as to Dr. Metheeney's testimony. It's irrelevant ... what happens in other cases, to other people." Asked for an offer of proof, defense counsel replied that the witness had personally visited with appellant, filled out a form he had devised and the information on the form was fed into a computer in order to determine the statistical severity of the abuse appellant had suffered in relation to the other 542 women. Defense counsel told the trial judge that since self defense had been raised, part of the issue involved "the apprehension of the fear of violence and the propensity of the deceased to perpetrate [violent] acts testified to ... all going to help the fact-finder in evaluating these affirmative issues from the standpoint of the accused." The trial court delayed ruling until after appellant made her bill of exception.

Without going into the details of Dr. Shupe's testimony, it is sufficient to say it was his expert opinion, based on the information appellant had given him and his computerized statistical analysis of it, that Darwin Fielder was in the 98th percentile for severity of battering husbands; restated, only 2% of men about whom Dr. Shupe had information, had been more violent than Darwin Fielder. Dr. Shupe testified the level of violence experienced by appellant was "exceptionally high".

The trial judge told counsel he had tried to relate the evidence to the issue of whether the defendant had acted in protecting herself under Texas self defense law and found the evidence had "no relevance". Thereafter, the testimony of an associate of Dr. Shupe, William A. Stacy, Ph.D., was excluded upon the State's objection that it was hearsay and irrelevant.

In the Court of Appeals, appellant complained of the trial court's exclusion of the testimony of these three expert witnesses and argued the testimony was admissible

under V.T.C.A., Penal Code, Section 19.06.[6] The Court of Appeals held Dr. Matheeney's opinion was inadmissible because, essentially, it was not relevant to any issue before the jury.[7] The Court below also was of the opinion that, even if relevant, exclusion of the testimony was harmless because it would be of no assistance to the trier of fact: the "reasonableness of [appellant's] fear of suffering death or serious bodily injury was a matter within the comprehension of the average juror". 683 S.W.2d at 594.

The testimony of Doctors Shupe and Stacy was held to be inadmissible not only because it was irrelevant, but also because it was not shown to be reliable, competent, expert testimony which would assist the jury in resolving an issue in dispute.

We granted review in order to determine the admissibility of the excluded expert testimony under Section 19.06, supra [hereinafter cited as 19.06]. ·

In *Werner v. State*, 711 S.W.2d 639 (Tex. Cr.App.1986), [hereinafter cited as *Werner* ], this Court addressed for the first time in modern times the perimeters of 19.06 as a rule of "relevance". There, we reiterated and emphasized the facts that 19.06 in no way broadens or otherwise affects the rules of evidence which apply, or the *way* in which they apply in any given homicide case; that collateral facts which do not logically tend to prove or disprove matters in issue are not admissible. Section 19.06 permits two types of evidence: (1) all "facts and circumstances surrounding the killing" which are probative of the *material* "condition of the mind of the accused at the time of the offense"; and,

(2) all "facts and circumstances surrounding ... the previous relationship existing between the accused and the deceased" which are probative of the *material* "condition of the mind of the accused at the time of the offense."

■ What are the material issues in a given· homicide case? The theory of the prosecution and the defensive theory or theories determine the "material" issues in each individual case. E.g. *Werner*.

In the instant case, the State's prosecution was predicated upon V.T.C.A., Penal Code, Section 19.02(a)(1), which provides, "a person commits an offense if he *intentionally* or *knowingly* causes the death of an individual". Thus, the material "condition of mind" issues raised thereby were: (1) whether it was appellant's "conscious objective or desire to ... cause [Darwin Fielder's death]" at the time of the homicide;[8] and, (2) Whether appellant was "aware that [her] conduct [was] reasonably certain to cause [Darwin Fielder's death]" at the time of the homicide.[9]

Appellant claimed, in essence, that at the moment she shot the deceased, she believed he would kill her if she did not kill him first. This claim raised the justification defense under V.T.C.A., Penal Code, Section 9.31(a), which provides a person is "justified in using force against another when and to the degree *he reasonably believes* the force is immediately necessary to protect himself...." The use of deadly force in self defense is set forth in V.T.C.A., Penal Code, Section 9.32(2) and (3), which provide the use of deadly force is permitted when the accused *"reasonably*

---

**6.** "In all prosecutions for murder or voluntary manslaughter, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense."

**7.** Specifically, the Court of Appeals cited the following reasons for determining the opinion was not relevant: (1) since Dr. Matheeney never examined appellant or reviewed the facts of the case, she was "incapable of rendering an opin-

ion as to [appellant's] mental state ... at the time of the shooting", 683 S.W.2d at 591; (2) the testimony did not establish appellant was a "battered woman", 683 S.W.2d at 595; (3) the statutory duty to retreat is not illuminated by the reasons appellant did not leave *"prior* to· the incident", 683 S.W.2d at 592; (4) the reasons recited for staying in a relationship do not show "a need to act in self-defense by using deadly force", 683 S.W.2d at 593.

**8.** See V.T.C.A., Penal Code, Section 6.03(a).

**9.** See V.T.C.A., Penal Code, Section 6.03(b).

*believes* the deadly force is immediately necessary....", and "a reasonable person in the [accused's] situation would not have retreated." Thus, the "condition of mind" issues raised by self defense by deadly force are: (1) whether the accused reasonably believed [10] the use of deadly force was immediately necessary; and, (2) whether the accused's assessment of the situation reasonably indicated he could have retreated.[11]

█ It is apparent that Dr. Matheeney's testimony was responsive to the State's cross and re-cross-examination of appellant as to why she did not leave Darwin or seek help from a third party during the course of their marriage. Therefore, the admissibility of the testimony is entirely dependent upon the determination of exactly what legitimate inference the State sought to raise by that cross-examination.

In the instant case, appellant's theory of the case was that she had suffered tortuous physical, emotional and sexual abuse at the hands of her husband; that this violent prior relationship convinced her he could and would kill her if she disclosed his sexual proclivities to anyone else; that on the night of the homicide, when she revealed she had discussed their relationship with an attorney, she tried to run away, but he pulled a firearm and indicated verbally he would make good on past threats to kill her; that because of her fear and belief he would kill her, when given the opportunity, she grabbed the gun and shot him to death.

The State's theory was that appellant was a competent professional woman who was madly in love with her husband; that even though Darwin went a bit too far in his sex "games", appellant willingly participated in and enjoyed most of them. Thus, appellant's prior relationship with Darwin did not produce in her a fear of him as she claimed, but rather, when she found out he was involved with another woman, she pulled a gun and shot her husband in a jealous rage.

Thus, of the four "condition of mind" issues which were raised by the parties' respective theories, the only one which was contested was the reasonableness of appellant's apprehension of fear that Darwin was about to use deadly force against her at the time of his killing. This was the main contested issue in the case.[12]

Viewed in this context and in light of the trial testimony as a whole, it is clear that the inference the State sought to have the jury draw from the questioned cross and re-cross-examination was that appellant, in fact, was *not afraid* of Darwin as a result of his violent acts during the marriage, or that her fear was not of a degree to warrant the inference that she reasonably believed he was going to kill her at the time of the shooting.

In order to establish her "fear" (apparent danger from her standpoint) at the time of the offense, appellant produced past violent encounters with the deceased. *Williams v. State*, 14 Tex.App. 102 (1883). This is an established method of proof in self-defense cases, because the law recognizes the fact that future conduct may be reasonably inferred from past conduct.[13]

10. V.T.C.A., Penal Code, Section 1.07(a) (31) provides that "reasonable belief" means "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor".

11. Depending on the facts of the case, other "condition of mind" issues may arise. E.g. Section 9.31, supra, subsection (b)(4)(A).

12. There was also a marginal dispute as to who was, in fact, the aggressor. But this is an issue as to an objective, historical fact which implicates neither the accused's state of mind, nor, therefore, Section 19.06. See *Thompson v. State*, 659 S.W.2d 649 (Tex.Cr.App.1983); *Mahaffey v. State*, 471 S.W.2d 801 (Tex.Cr.App. 1971); *Dempsey v. State*, 159 Tex.Cr.R. 602, 266 S.W.2d 875 (1954).

13. In the Court's Charge to the jury, this phase of the law was set out as follows:
It is not necessary that there be an actual attack or attempted attack, as *a person has a right to defend her life and person from apparent danger as fully and to the same extent as she would had the danger been real, provided that she acted upon a reasonable apprehension of danger, as it appeared to her from her standpoint at the time,* and that she reasonably believed such force was immediately necessary to protect herself against the other person's use or attempted use of unlawful deadly force.
You are further instructed that *in determining the existence of real or apparent danger,* it is your duty to consider all of the facts and

See generally *Horbach v. State*, 43 Tex. 242 (1875); cf. *Thompson v. State*, 659 S.W.2d 649 (Tex.Cr.App.1983); [14] See also *Mahaffey v. State*, 471 S.W.2d 801 (Tex.Cr. App.1971); *Dempsey v. State*, 159 Tex.Cr. R. 602, 266 S.W.2d 875 (1954).

In order to diffuse and contest appellant's evidence, the State suggested the "prior relationship" conduct of appellant in staying in an abusive relationship with the deceased, negated her "prior relationship" evidence, and therefore, also negated the reasonableness of her "fear" at the time of the shooting. Appellant was therefore entitled to explain that she stayed with Darwin for reasons which were not inconsistent with that fear. Dr. Matheeny's testimony was offered to revitalize the violent *past* of the parties, in order to rehabilitate the inference of appellant's ultimate apprehension of danger *at the time of the killing. Id; Williams v. State*, supra.

The State contends that Dr. Matheeny's testimony should be excluded under the same rationale that compelled exclusion of the expert testimony offered on the "holocaust survivors syndrome" in *Werner*. In that case, self-defense was not an issue. The testimony Werner offered to raise self defense did not raise it. The excluded evidence did not relate to the "prior relationship" between *Werner and the deceased;* there was no suggestion that the two had ever previously encountered one another. Therefore, the evidence was in no way probative of the reasonableness of Werner's apprehension of fear of *the deceased.* We concluded there that the excluded evidence did no more than explain why Werner was more likely to use deadly force than the average person when confronted by *any* aggressor. *Werner* makes it clear that the only "past experience" contemplated by

Section 19.06 to be probative of the accused's state of mind at the time of the killing, is that which comprehends the defendant's experiences *with the deceased.*

█ In contrast to *Werner,* appellant here sought to invoke the well settled rationale that a reasonable person will have a just apprehension of fear of another with whom he has had prior violent conflict. There was nothing about Dr. Matheeney's testimony which suggested appellant was entitled to "an enlargement of the statutory defense on account of [her] psychological peculiarities", 711 S.W.2d at 645, as the State now contends. Rather, Section 19.06 acknowledges the relevant "condition" of a defendant's mind is composed of the sum of his experiences with the deceased.

In this case, the State sought to establish a credible and· compelling version of the facts. Necessary to that version was the diffusion of the force of appellant's evidence regarding Darwin's violent propensities and past acts of aggression against appellant. Appellant was, in turn, entitled to rebut the inference that her conduct in the prior relationship was inconsistent with her claim of fear of Darwin. We fail to see in what way this rebuttal evidence could be viewed as an "enlargement of the statutory defense." It follows that the Court of Appeals erred in determining the testimony of Dr. Matheeney was irrelevant to any issue before the jury.

█ Moreover, the Court of Appeals' determination that Dr. Matheeney could not offer an opinion based solely on the hypothetical question posed at trial is clearly incorrect. See *Holloway v. State,* 613 S.W.2d 497 (Tex.Cr.App.1981); *Robertson v. State,* 463 S.W.2d 18 (Tex.Cr.App.1971). Also, the holding by the Court of Appeals

circumstances in the case in evidence before you and *consider the words, acts, and conduct, if any, of Darwin L. Fielder* at the time and *prior to the time of the alleged shooting and consider whatever threats,* if any, the said *Darwin Fielder may have made to the defendant, and* consider *any difficulty or difficulties which the said Darwin L. Fielder had had with the defendant,* and in considering such circumstances, you should place yourselves in defendant's position at that time and view

them from her standpoint alone. (emphasis supplied).

14. When self defense is raised, "the deceased's reputation for violence and commission of prior specific acts of violence against third parties *which are known to the defendant* are probative of whether the defendant reasonably believed the force he used was immediately necessary to protect himself. [Emphasis original]." 659 S.W.2d at 653.

that appellant was required to establish herself to be "a battered woman" by direct expert testimony is patently erroneous. Cf. *Denham v. State,* 574 S.W.2d 129 (Tex. Cr.App.1978), overruling *Harris v. State,* 562 S.W.2d 463 (Tex.Cr.App.1978); and *Danzig v. State,* 546 S.W.2d 299 (Tex.Cr. App.1977). The fact that Dr. Matheeney was able to offer an opinion upon the hypothetical question inferentially established that those hypothetical facts fell within the scope of the witness' experience and expertise. See R. Ray, Law of Evidence, 2 *Texas Practice* Section 1401 (3rd ed. 1980); see generally *Holloway,* supra.

 Finally, we hold the Court of Appeals erred in concluding Dr. Matheeney's testimony would be of no assistance to the trier of fact. By her testimony, Dr. Matheeney established the average lay person has no basis for understanding the conduct of a woman who endures an abusive relationship. Indeed, it was this verity upon which the State sought to capitalize in portions of its cross and re-cross-examination of appellant. To the extent that the expert could explain the endurance of the hypothetical woman in a way that the jury could infer it is consistent with a claim of fear of the abuser, that testimony was of "appreciable aid" to the trier of fact. Appellant established this is a "subject ... upon which expert opinion would assist the jury." 613 S.W.2d at 501.

We further do not agree with the Court of Appeals' determination that the testimony of Doctors Shupe and Stacy was irrelevant or unreliable because it was based on information provided by appellant. Appellant's personal perception of the severity of the aggression against her was likewise probative of her apprehension of fear of death at the time of the killing. Our reading of the record as a whole, how-

ever, convinces us that appellant's perception of the severity of the abuse was fully established by her and remained an uncontested issue.[15] Therefore, the evidence was in the nature of cumulative testimony, the admission of which is largely left to the sound discretion of the trial judge. Therefore, under the circumstances of this case, we cannot say the exclusion of this evidence by itself, warrants reversal of appellant's conviction.

However, because the trial court erred in excluding Dr. Matheeney's testimony from the jury's consideration, the judgment of the Court of Appeals must be reversed. We observe the Court below held the exclusion of Dr. Matheeney's testimony, if error, was harmless for reasons set out in n. 6, and accompanying text, *ante.* Our review of this case has included consideration and rejection of the reasons the Court of Appeals cited for the harmless error determination. In sum, we do not agree the exclusion of this evidence was harmless beyond a reasonable doubt. See Rule 81(b)(2), Texas Rules of Appellate Procedure.

Accordingly, the judgments of the trial court and the Court of Appeals are reversed and this cause is remanded to the trial court for a new trial in accordance with V.A.C.C.P., Article 44.29(a).

It is so ordered.[16]

To the extent that the majority opinion does not conflict with his dissent in *Werner v. State,* 711 S.W.2d 639 (Tex.Cr.App. 1986)., Judge TEAGUE joins.

ONION, P.J., and McCORMICK, J., dissent.

15. As we understand the State's theory of the case, there was only a contested issue as to the *effect* of Darwin's violent conduct on appellant's mental state. Our handling of this ground for review is predicated on this understanding.

16. For the first time, the State has alleged in the State's Brief filed in this Court, and after our grant of review, that appellant's contention on

appeal varies from her objection at trial. In spite of the fact that this argument was not presented to the Court below, we are nevertheless now urged to affirm the judgment of that Court on this basis. Obviously, we have declined to do so, and we now hold, in our discretion, it is too late for the State to urge such a contention at this time.