# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00390-CR

---

**Roberto Garcia, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 22ND DISTRICT COURT OF COMAL COUNTY**
**NO. CR2023-255, THE HONORABLE DIB WALDRIP, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Roberto Garcia of assault family violence with a previous conviction, a third-degree felony enhanced by Garcia's habitual-felony offender status. *See* Tex. Penal Code §§ 12.42(d), 22.01(b)(2)(A). The jury assessed punishment at fifty years' imprisonment, and the district court sentenced Garcia accordingly. Garcia challenges his conviction in four issues, contending that (1) there is insufficient evidence of the previous family-violence conviction; (2) the jury charge provided an incomplete "dating relationship" definition; (3) the district court admitted expert testimony on irrelevant matters; and (4) the charge on punishment did not define "final" for any final-conviction finding, and the application paragraph did not require the jury to make a final-conviction finding. We will affirm the district court's judgment of conviction.

# BACKGROUND

The jury heard evidence that on or about April 20, 2019, Garcia assaulted his wife, Mary Smith.[1]  Smith did not appear at trial.  Instead, evidence of the assault was presented in testimony from a 911 caller, the law-enforcement officers who investigated the case, and an EMS paramedic who treated Smith after the assault.  Videos from the officers' body cameras were admitted into evidence and showed their interactions with Garcia and Smith.

The 911 caller, Leslie Vinka, testified that she was driving on Highway 281 in Spring Branch on April 20, 2019, when she witnessed an altercation between two people who were "fighting" or "wrestling" outside a truck parked near the roadway.  In her 911 call, Vinka described the truck's color, make, and model to the dispatcher.  Vinka also said that as she drove by, it appeared the "two males" who were initially fighting on the side of the road had wrestled to the ground and were down in a ditch.[2]

Comal County Sheriff's Office (CCSO) Patrol Deputy Adam McCosh and Sergeant Bradley Graham were dispatched to the area reported and initially did not see the truck.  While driving back toward their assigned district space, Sergeant Graham saw the truck near the entrance to the Indian Hills subdivision and initiated a traffic stop.  He spoke to the driver of the vehicle, later identified as Garcia, who was "not the most cooperative" and "appeared to be under the influence of something."  Garcia told Sergeant Graham that he and his passenger—the victim Smith—were heading to where they were staying in the Indian Hills neighborhood and

---

[1]  Mary Smith is the pseudonym used in the indictment to protect the victim's identity. Although her actual name was disclosed during trial, we will continue using the pseudonym in this opinion.  *See* Tex. Code Crim. Proc. art. 58.102.

[2]  Deputy Adam McCosh later testified that the victim had a "masculine haircut, very short" and "[t]o somebody passing at 60 miles an hour, I imagine it look[ed] like a male."

2

got into an argument about what would be made for dinner. He also told Sergeant Graham that Smith had a nosebleed. When Sergeant Graham asked Garcia questions about the fight, Garcia asked Sergeant Graham whether he saw it and could testify to that. Garcia produced his driver's license from a wallet in a pocket of his shorts and produced Smith's driver's license from his other pocket. While holding Garcia's license, Sergeant Graham asked Garcia for his address. Garcia said he could not remember it but told Sergeant Graham, "We're living in Marble Falls."

Sergeant Graham told the jury that Smith "had a cut to her ear" and "blood all over her shirt," and he saw "fresh blood" inside the truck on the passenger's side where she had been seated. He testified that Smith had burrs on the back of her shirt, "which meant that she was on the ground," but Garcia did not have any burrs on his clothing. Sergeant Graham asked Garcia what his relationship to the passenger was, and Garcia responded that he and the passenger had been dating for about a year. Once in the patrol car, Garcia accused Sergeant Graham of taking his truck and commented about his "crazy girlfriend."

Deputy McCosh spoke to Smith. He testified that she was "very, very distraught" and difficult to understand "because she was crying so heavily." She had dried blood around her nose and mouth. She was wearing undergarments and a button-up sweater that had "fresh bloodstains," sticker burrs, and grass on it. Deputy McCosh testified that the burrs and grass on her sweater were signs of an altercation outside the vehicle and having been on the ground. Smith also appeared to be under the influence of alcohol.

When Deputy McCosh asked Smith what happened, she stated, "He hit me," and "I want to go back home, he wouldn't take me home." Deputy McCosh performed a "lethality assessment," which he testified was a series of questions included as part of a family-violence packet that officers use when responding to family-violence calls to obtain information about

3

what happened and any potential dangers that exist or may exist in the future. Deputy McCosh also provided Smith with a pseudonym and testified that "pseudonyms typically come into play when we're dealing with family violence, sexual assault, or stalking." Smith told Deputy McCosh that she lived with Garcia in the Indian Hills neighborhood, where the traffic stop occurred, although she did not provide an address. Deputy McCosh testified that in his experience, not all family-violence victims want to prosecute criminal cases because "they're usually afraid of retribution" or "they just don't want to be involved in the court process."

EMS paramedic Gabriel Torres evaluated Smith at the scene of the traffic stop and his completed patient-care report was admitted into evidence. Torres's report noted that there was blood inside and around Smith's nostrils. Additionally, during her EMS evaluation, Smith referred to Garcia as her "husband." Smith told Torres that her husband had hit her in the face, "punch[ing]" her nose multiple times. When the CCSO investigation concluded, Garcia was arrested for assault family violence.

CCSO Detective Eric Guerrettaz, a specialist in family-violence investigations, testified generally about the cycle of family violence, discussed how being in possession of a victim's personal belongings could be an example of a party's exertion of power and control over the victim, and noted that "in at least half of the cases we work, the victims don't support criminal charges." Detective Guerrettaz explained that in such cases, the investigation continues with the goal of breaking the cycle of violence. He testified that often victims need outside assistance "to work past it and find their way out."

The next witness was Ronnie Womack, a CCSO fingerprint-identification expert, who identified Garcia in court as the person from whom Womack had taken a set of inked fingerprints on a ten-print card. Womack compared the known set of Garcia's fingerprints with a

prior set of fingerprints on a ten-print card—admitted into evidence as part of a certified criminal-history record—for a May 20, 2004 conviction for aggravated assault with a deadly weapon. Womack testified that the known and prior sets of fingerprints matched. In addition to the ten-print cards, Womack reviewed an information and a marriage license that were admitted into evidence. He testified that the May 20, 2004 information charged defendant "Roberto Garcia" with committing aggravated assault by using and exhibiting a deadly weapon, a knife, that was capable of causing death or serious bodily injury and caused bodily injury to the complainant O.G.[3] by cutting her. When the prosecutor published the May 14, 2004 marriage license to the jury, she asked Womack, "Are these the two people that you identified earlier?" Womack confirmed that they were. He further testified that the May 20, 2004 date of arrest occurred after the date of marriage. Evidence of another prior offense, Garcia's 1995 judgment of conviction for deadly conduct, was also admitted during trial.

CCSO Sergeant Travis Stahl, whose responsibilities include serving as criminal records custodian for the county jail, testified that booking sheets are typically completed when an inmate is booked at the jail and that the information in the booking sheets is provided by the inmate. Similarly, Sergeant Stahl told the jury that jail-visitation logs were completed using information from inmates. Comal County jail records admitted into evidence at trial showed that Garcia identified Smith on a jail-visitor log, and that the address that Garcia listed for Smith was the same as the address listed on his arrest and booking sheets.

During the defense's case in chief, Garcia introduced evidence of Smith's "Affidavits" that he mailed to the district attorney and the district clerk, demanding dismissal of

---

[3] The complainant's name is spelled out in the information, and the complainant's first name is the same as the first name on the marriage license.

5

the charges against him, stating that he is not liable for any assault against Smith, and identifying Smith as the aggressor. After trial, Garcia was convicted and sentenced, and he filed this appeal.

## DISCUSSION

**Sufficiency of evidence**

Garcia contends that the evidence is insufficient to prove that he had a prior family-violence conviction and that he and Smith were in a dating relationship. To determine whether evidence is sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *Gear*, 340 S.W.3d at 746; *Brooks*, 323 S.W.3d at 899. In other words, sufficient evidence supports a conviction, and thus a jury's verdict is rational, if the inferences necessary to establish guilt are reasonable based on the cumulative force of all the evidence when considered in the light most favorable to the verdict. *Edward v. State*, 635 S.W.3d 649, 655-56 (Tex. Crim. App. 2021). When faced with conflicts in the evidence, a reviewing court shall presume that the jury resolved those conflicts in favor of the verdict and defer to that determination. *Id.* at 656.

Under subsection 22.01(b)(2) of the Penal Code, the offense of assault causing bodily injury to another is enhanced from a Class-A misdemeanor to a third-degree felony if

(1) the defendant commits the assault against a person who is a member of the defendant's family, who is a member of the defendant's household, or with whom the defendant has or has had a dating relationship; and (2) the defendant has a previous conviction for family violence. Tex. Penal Code § 22.01(a)(1), (b)(2)(A). To establish a defendant's conviction of a prior offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the defendant is linked to that conviction. *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). But Texas law does not require that the fact of a prior conviction be proven in any specific way. *Id*. at 922. "Any type of evidence, documentary or testimonial, might suffice." *Id*.

The judgment on Garcia's 2004 prior conviction for aggravated assault with a deadly weapon does not contain an affirmative finding of family violence because the box for marking "Y or N" next to "domestic violence offense" is blank. *See State v. Eakins*, 71 S.W.3d 443, 445 (Tex. App.—Austin 2002, no pet.) (noting that lack of affirmative finding that family violence was involved in prior offense "does not necessarily mean that the court considered the issue and determined that family violence was *not* involved"). If a trial court determines that an offense involves family violence, the Code of Criminal Procedure requires the trial court to make an affirmative finding of that fact and enter the affirmative finding in the judgment of the case. Tex. Code Crim. Proc. art. 42.013. Even without that statutory finding, the State may meet its burden of proving that the defendant has been previously convicted of assault and that the assault was committed against a member of the defendant's family or household "by introducing a previous judgment of conviction for assault, together with extrinsic evidence that the victim of that assault was a member of the defendant's family or household." *Mitchell v. State*, 102 S.W.3d 772, 775 (Tex. App.—Austin 2003, pet. ref'd) (rejecting argument that proof of previous conviction for assault against family or household member necessarily requires article

7

42.013 finding in earlier assault judgment); *Eakins*, 71 S.W.3d at 445 (concluding that absence of affirmative finding in judgment of conviction for previous assault "does not in itself preclude the introduction of extrinsic evidence that the previous assault was committed against a family member").

Here, the district court admitted into evidence a May 20, 2004 information charging Roberto Garcia with committing aggravated assault with a deadly weapon against O.G., and a May 14, 2004 marriage license between Roberto Garcia and O.L. Garcia complains that aside from the same first name, nothing in the evidence suggests that the victim named in the information and the wife named in the marriage license were the same person. We disagree.

After reviewing the information and the marriage license, Womack was asked generally and without objection whether these were the "two people" he had identified earlier, which he confirmed. This testimony, the unredacted charging instrument, and the unredacted marriage license support the jury's rational inference that the victim named in the information was the same person Garcia had married six days earlier.[4] Thus, a rational jury could have concluded beyond a reasonable doubt that Garcia had previously been convicted of an offense involving family violence. We presume that the jury resolved any evidentiary conflicts in favor of their verdict and defer to that determination. *Edward*, 635 S.W.3d at 656. The evidence at trial, viewed in its totality and in the light most favorable to the jury's verdict, is sufficient to support a rational finding that the victim, O.G., was a member of Garcia's family or household when he assaulted her. *See Mitchell*, 102 S.W.3d at 775.

---

[4] Drawing on their common knowledge and experience, the jurors could have reasonably inferred that when O.L. married Roberto Garcia in 2004, she changed her last name to his. *See Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023) (recognizing that jury may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence).

Likewise, the State presented sufficient evidence that Garcia and Smith were in a dating relationship. Sergeant Graham testified that Garcia said he had been dating Smith for one year. Garcia also told him, "We're living in Marble Falls." Later in the patrol car, Garcia referred to Smith as his "crazy girlfriend." Deputy McCosh testified that Smith said she and Garcia lived together. Paramedic Torres testified that Smith referred to Garcia as her "husband." Jail records admitted into evidence showed that Garcia identified Smith on a jail-visitor log and that the address he listed for her was the same as the address on his arrest and booking sheets. The jury could have reasonably inferred from this evidence that Garcia and Smith were in a dating relationship. *See Edward*, 635 S.W.3d at 651 (concluding that intermediate court of appeals erred by disregarding circumstantial evidence of dating relationship between defendant and victim that supported jury's verdict). Thus, we conclude that the evidence at trial, viewed in its totality and in the light most favorable to the jury's verdict, is sufficient to prove that Garcia had a prior conviction for the offense of assault-family violence and that he was in a dating relationship with Smith. We overrule Garcia's first issue.

**"Dating relationship" definition in jury charge**

Garcia also contends that the jury charge provided an incomplete "dating relationship" definition because it did not include language from the Family Code that he says distinguishes casual social relationships from serious ones. *See* Tex. Fam. Code § 71.0021(c) ("A casual acquaintanceship or ordinary fraternization in a business or social context does not constitute a 'dating relationship' under subsection (b)."). [5] When reviewing a charge-error

---

[5] Garcia argues that "[w]here the existence of a dating relationship is at issue, leaving out [subsection] 71.002(c) from a jury charge is an error," but he cites no authority for that

9

complaint, we first determine whether error exists and then, if so, whether the resulting harm is sufficient to warrant reversal. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). Because Garcia failed to make any objection to the jury charge—instead affirmatively advising the district court that he had no objection to it—we will not reverse the judgment of conviction unless the error, if any, constitutes "egregious harm." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). Charge error is egregiously harmful only if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Id.*

The jury charge contained this definition of "dating relationship":

> Subsection 71.0021(b) of the Texas Family Code provides that "dating relationship" means a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature. The existence of such a relationship shall be determined based on consideration of: (1) the length of the relationship; (2) the nature of the relationship; and (3) the frequency and type of interaction between the persons involved in the relationship.

> "Dating relationship" means a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature.

Although the Penal Code does not define "dating relationship," subsection 22.01(b)(2) of the Penal Code references subsection 71.0021(b) of the Family Code, which defines that phrase. *See* Tex. Penal Code § 22.01(b)(2); Tex. Fam. Code § 71.0021(b). "Dating relationship" is defined in the Family Code as "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature." Tex. Fam. Code § 71.0021(b). Further, the statute describes three considerations for determination of whether a dating relationship exists: (1) the length of the relationship; (2) the nature of the relationship; and

---

argument. *Cf.* Tex. R. App. P. 38.1(i) (requiring citations to appropriate authority in support of argument in brief).

(3) the frequency and type of interaction between the persons involved in the relationship. *Id.* The statutory definition in subsection 71.0021(b) is the same one that the district court provided to the jury. *See Milligan v. State*, 554 S.W.2d 192, 196 (Tex. Crim. App. 1977) ("[A] definition in a charge tracking the statutory definition given to a specific term is sufficient.").

Moreover, the "dating relationship" definition in this jury charge tracks the model definition in the Texas Criminal Pattern Jury Charge, which is itself consistent with the statute:

> A "dating relationship" is one between individuals who have or have had a continuing relationship of a romantic or intimate nature. The existence of such a relationship shall be determined based on consideration of—
>
> 1. the length of the relationship;
>
> 2. the nature of the relationship; and
>
> 3. the frequency and type of interaction between the persons involved in the relationship.

Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Criminal Pattern Jury Charges: Offenses Against the Family* CPJC 25.22 (2025). Thus, we disagree that the "dating relationship" definition in the jury charge was erroneous. Having concluded that no error in the charge exists as to this definition, we need not conduct a harm analysis. *See Price*, 457 S.W.3d at 440. We overrule Garcia's second issue.

**Admission of expert testimony**

Next, Garcia contends that the district court admitted expert testimony on irrelevant matters. He argues that because "the record never established any kind of actual romantic relationship" and because Smith "never testified before the jury," Detective Guerrettaz's testimony "regarding cyclical family violence never became relevant." A trial

11

court's decision to admit expert testimony is reviewed for an abuse of discretion and may not be reversed unless that ruling fell outside the zone of reasonable disagreement. *Blasdell v. State*, 470 S.W.3d 59, 62 (Tex. Crim. App. 2015).

Texas Rule of Evidence 702 governs the admissibility of expert testimony. *Id.* Rule 702 authorizes a witness who is "qualified as an expert by knowledge, skill, experience, training or education" to "testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. Thus, admission of expert testimony requires showing that (1) the witness qualifies as an expert by reason of her knowledge, skill, experience, training, or education; (2) the testimony's subject matter is appropriate for expert testimony; and (3) admitting the expert testimony will aid the factfinder in deciding the case. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Id*. Garcia challenges only relevance.

The relevance inquiry is whether the expert testimony will assist the trier of fact and is sufficiently tied to the facts of the case. *Tillman v. State*, 354 S.W.3d 425, 438 (Tex. Crim. App. 2011). Detective Guerrettaz, a specialist in family-violence investigations, testified:

- family violence is a cycle consisting of different phases including periods of abuse and "honeymoon periods" when things get a little better and then worsen again;

- family violence is exerting power and control over someone else, including withholding access to things like money, a car, and the freedom to visit other people; and

- family-violence victims often resist law enforcement's efforts to proceed with criminal cases.

12

He specifically discussed how being in possession of a victim's personal belongings—such as Garcia's possession of Smith's driver's license and cell phone[6]—could be an example of a party's exertion of power and control over the victim, and he explained that in at least half of the cases worked, the victims do not support criminal charges and need outside assistance "to work past it and find their way out."

We note that the jury was presented with evidence that Garcia and Smith had been dating for a year, that Smith referred to him as her "husband," and that they lived together—all of which contradict Garcia's contention that proof of their "romantic relationship" was lacking in the record. Further, Texas courts have found expert testimony about the dynamics of domestic violence admissible under Rule 702. *See, e.g.*, *James v. State,* 623 S.W.3d 533, 553-55 (Tex. App.—Fort Worth 2021, no pet.); *Dixon v. State*, 244 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (concluding that expert testimony from police officer trained and experienced in family-violence cases was admissible and helpful to jury in understanding post-assault behavior of family-violence victim); *accord Capello v. State*, No. 03-05-00553-CR, 2006 WL 2453021, at *4 (Tex. App.—Austin Aug. 25, 2006, pet. ref'd) (mem. op., not designated for publication) (concluding that expert testimony on behavior of domestic-violence victims was relevant because it assisted jury in understanding why victim might lie to police).

Detective Guerrettaz's testimony was relevant to explain why Smith may have decided against appearing at trial and declined to pursue assault charges against Garcia. The relevance of this testimony was heightened because Garcia's defensive theory relied on Smith's

---

[6] Detective Guerrettaz testified that he learned from police officers' written reports that Garcia had Smith's cell phone and her driver's license on his person. *See* Tex. R. Evid. 703 (allowing expert to base opinion on facts or data in case that expert has been made aware of, reviewed, or personally observed).

reluctance to prosecute. Additionally, Detective Guerrettaz's testimony was relevant because the average juror is typically unfamiliar with the effects of domestic violence on victims and the dynamics of the relationship between an abuser and victim. *See James*, 623 S.W.3d at 554; *see also Fielder v. State*, 756 S.W.2d 309, 321 (Tex. Crim. App. 1988) (concluding that expert's testimony explaining endurance of hypothetical woman would be helpful to jury in understanding conduct of woman who endures abusive relationship, which average lay person has no basis for understanding). Concepts and terms such as the "cycle of violence" and "power and control" are ones that experts on domestic violence use to explain the general relationship between an abuser and victim. *James*, 623 S.W.3d at 554. Garcia has not cited any legal authorities holding that expert testimony as to the cycle of family violence is irrelevant unless the victim also testifies at trial. *See* Tex. R. App. P. 38.1. We conclude that Detective Guerrettaz's expert testimony assisted the trier of fact and was sufficiently tied to the facts of the case. *See Tillman*, 354 S.W.3d at 438. Thus, his testimony was relevant, and the district court's admission of that testimony was not outside the zone of reasonable disagreement. *See Blasdell*, 470 S.W.3d at 62. We overrule Garcia's third issue.

### "Final" conviction in punishment charge

Lastly, Garcia contends that the charge on punishment was flawed because it did not define "final" for any final-conviction finding and because the application paragraph did not require the jury to find that Garcia's DWI convictions were final. Because Garcia failed to make any objection to the punishment charge—instead affirmatively advising the district court that he had no objection to it—we will not reverse the judgment of conviction unless the error, if any,

14

constitutes "egregious harm." *See Villarreal*, 453 S.W.3d at 433. We will not conduct an egregious-harm analysis unless charge error is first shown. *See Price*, 457 S.W.3d at 440.

Subsection 12.42(d) of the Penal Code allows the punishment for certain repeat and habitual felony offenders to be enhanced to a twenty-five-year minimum sentence. The statute provides—with exceptions inapplicable here—that:

> [I]f it is shown on the trial of a felony offense other than a state jail felony punishable under Section 12.35(a) that the defendant has previously been finally convicted of two felony offenses, and the second previous felony conviction is for an offense that occurred subsequent to the first previous conviction having become final, on conviction the defendant shall be punished by imprisonment in the Texas Department of Criminal Justice for life, or for any term of not more than 99 years or less than 25 years.

Tex. Penal Code § 12.42(d).

The Court of Criminal Appeals has determined that "when the State offers into evidence a certified copy of a judgment and sentence, it has made a prima facie showing that the conviction reflected in that document is a final conviction worthy of respect." *Jones v. State*, 77 S.W.3d 819, 822-23 (Tex. Crim. App. 2002). If a prior judgment has been set aside, vacated, or appealed, the defendant has the burden of offering some evidence to support that fact. *Id.* at 823-24 (noting that "possibility of future appeal" is insufficient evidence of perfected appeal). If the record evidence establishes that a prior conviction was appealed, that conviction "becomes final when the appellate court issues its mandate affirming the conviction." *Ex parte Chandler*, 182 S.W.3d 350, 357 (Tex. Crim. App. 2005) (quoting *Beal v. State*, 91 S.W.3d 794, 796 (Tex. Crim. App. 2002)).

During the punishment phase, the State offered evidence of certified judgments showing Garcia's prior convictions, including DWIs in 1989 and 2000. Womack, who took

Garcia's fingerprints in this case, testified that he compared Garcia's known set of fingerprints with the fingerprints associated with Garcia's prior judgment of conviction from 2000 and determined that they were a match. Other identifiers—including Garcia's full name, address, and cause numbers—confirmed that the judgment of conviction in 1989 was also Garcia's.

By the time this case proceeded to punishment, whether Garcia had filed a timely notice of appeal in his DWI cases from 1989 and 2000, thereby creating an issue as to the finality of those convictions, was an ascertainable fact on which he bore the burden of proof. *See Milburn v. State*, 201 S.W.3d 749, 753 (Tex. Crim. App. 2006); *see also See Davy v. State*, 525 S.W.3d 745, 752 (Tex. App.—Amarillo 2017, pet. ref'd) (rejecting defendant's contention that jury charge on punishment was erroneous for lack of definition of words "final" and "finally" and noting that defendant "made no attempt to rebut the presumption of finality" of his prior convictions). When the State offered into evidence the judgments related to Garcia's previous convictions, Garcia presented no evidence that his convictions from 1989 and 2000 were not final. Rather, the evidence in the record establishes that Garcia was finally convicted of two prior felony offenses, and that the second one is for an offense that occurred after the first one had become final. *See* Tex. Penal Code § 12.42(d).

When, as here, there is no evidence raising a question as to the finality of prior convictions used for enhancement, the Texas Criminal Pattern Jury Charges advise against inclusion of a jury instruction on finality. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Criminal Pattern Jury Charges: Punishment Instructions* CPJC 12.3 (2025) (concluding that "jury instructions defining finality would be cumbersome and potentially confusing and distracting" and recommending generally that "no definition of finality be included in the instructions"). Thus, we disagree that charge on punishment was erroneous for lack of (1) a

16

definition of the word "final" and (2) an application paragraph requiring the jury to find that Garcia's DWI convictions were final. Having concluded that no error in the punishment charge exists as to these complaints, we need not conduct a harm analysis. *See Price*, 457 S.W.3d at 440. We overrule Garcia's fourth and final issue.

## CONCLUSION

We affirm the district court's judgment of conviction.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Theofanis and Ellis

Affirmed

Filed: July 9, 2025

Do Not Publish