**AFFIRM; and Opinion Filed April 13, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01536-CR

### GREGORY SHANE BAILEY, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 15th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. 062872**

## OPINION

Before Justices Fillmore, Schenck,[1] and Thomas[2]
Opinion by Justice Fillmore

A jury found appellant Gregory Shane Bailey guilty of murder and assessed punishment of life imprisonment and a $10,000 fine. In three points of error, Bailey contends he was denied a fair trial as a result of mid-trial publicity, the trial court abused its discretion by admitting autopsy photographs of the decedent into evidence, and the trial court abused its discretion by admitting evidence of his prior bad acts in relation to the decedent and a former girlfriend. We affirm the trial court's judgment.

---

[1] The Honorable Justice Michael J. O'Neill, who was on the panel and participated in the submission of this case, retired December 31, 2014. Justice David J. Schenck succeeded Justice O'Neill. Justice Scheneck has read the briefs and reviewed the record and now serves as a member of the panel.

[2] The Honorable Linda Thomas, Chief Justice of the Court of Appeals for the Fifth District of Texas—Dallas, Retired, sitting by assignment.

**Background**[3]

The evening of February 7, 2013, Bailey called the police to report that his fiancé, Sarah Swaim, was missing. In his interviews with the police that were played for the jury, Bailey indicated that the evening before, he, Swaim, and their two-year-old daughter, L.B.,[4] were at home in their trailer in Sherman, Texas, where they had lived since December 2011 or January 2012. After putting L.B. to bed, Bailey and Swaim had been drinking shots of vodka and began to argue. Bailey told the police that Swaim was "running her mouth" and "griping" at him, but she was not being physical and that the last time they "got physical with each other" was over two years before when they were on drugs. He did not want to argue with Swaim, and he went to bed. A short time later, he heard the door to their trailer shut, and he had not seen Swaim since. Bailey told the police that when Swaim left the trailer, she was wearing a t-shirt and pink sweat pants with the word "sweet" on the back. Bailey told the police that Swaim could have walked to his stepfather's nearby trailer and that Swaim had done that before on a couple of occasions. The police contacted Bailey's stepfather, Mark Watkins, who had not seen Swaim during this time period. During a consensual search of Bailey and Swaim's trailer, police officers discovered blood on the outside of the clothes dryer, a banner from a baby shower with blood and hair on it, a pair of pink sweatpants with "sweet" on the back, a bloodstained gray t-shirt, and a towel with several red stains. After obtaining a search warrant, law enforcement officers found additional blood stains at a number of locations, and on a number of items, in the trailer.

Bailey testified during the guilt/innocence phase of trial. His testimony regarding the events of February 6, 2013 differed markedly from what he told the police when he reported

---

[3] Bailey does not challenge the sufficiency of the evidence to support his conviction. We will dispense with a recitation of facts unnecessary to the resolution of the points of error under consideration in this appeal.

[4] Minors are identified by their initials in this opinion.

Swaim missing and in his interviews with the police on February 7, 2013; in fact, he testified that most of what he told the police in the prior interviews was false. Bailey testified that he and Swaim were in the trailer drinking vodka shots on the night of February 6, 2013. Bailey testified that at one point in the evening, he was in the kitchen and heard Swaim "banging around" in the bedroom and yelling. When he went into the bedroom, Swaim was laying on the floor between the bed and the wall, bleeding from her mouth. She was yelling and flinging her arms and had a banner that had been hanging on the wall in her mouth. Bailey told Swaim to be quiet lest she wake L.B., who was sleeping in a crib next to the bed. Bailey tossed the banner onto the floor and threw his gray t-shirt down the hallway into the laundry room. He heard Swaim snoring as he laid down to go to sleep, and he did not think anything was wrong with Swaim other than her being intoxicated. The next morning, he discovered that Swaim had died. Bailey testified he and Swaim had not argued or fought on the evening of February 6, 2013, and he did not choke or strangle Swaim.

Bailey telephoned his employer, Bobby Tate, and Tate gave him permission to take carpet he had replaced in his trailer to a pile of trash to be burned on Tate's property. Tate and Garland Foscue, another of Tate's employees, saw Bailey unloading a roll of carpet from his van. When they heard Swaim was missing, Tate and Foscue decided to check the roll of carpet on the burn pile, and they found Swaim's body wrapped in black garbage sacks and rolled in the carpet. The police then arrested Bailey for Swaim's murder.

Texas Ranger Brad Oliver testified regarding photographs taken at the burn pile showing blood on, and bruising and injuries to, Swaim's body. Lynn Salzberger, M.D., testified regarding an autopsy she performed on Swaim while she was employed at the Dallas County Medical Examiner's Office. Salzberger testified that Swaim's body had bruises in various stages of healing on the top half of her body, including her head, neck, tongue, and face, as well as on

–3–

her legs, her pubic area, and at the opening of her vagina. Her bruised tongue suggested that injury was sustained during strangulation. Swaim's neck and throat injuries, including a broken bone in her thyroid cartilage or voice box, also were suggestive of blunt force and strangulation. Salzberger indicated the bruises on Swaim's pubic area and vagina could have resulted from blunt force injury, but could not have been caused by a fall. Swaim also had bruising in the spacing between her ribs on both sides of her chest, fresh rib fractures in the area of the bruising, and an old rib facture. She had bruising on her hands, suggestive of defensive injuries. Swaim's liver was lacerated, resulting in blood in her abdomen. According to Salzberger, Swaim's lacerated liver could only have been caused by the infliction of significant force. Swaim's blood alcohol level was .328, but Swaim did not die from alcohol poisoning. Salzberger testified that, while some of Swaim's injuries could have been the result of a fall, considering the number and locations of Swaim's injuries, it was not her opinion Swaim's death resulted from a fall. A number of Swaim's injuries could have been caused by the impact of a fist or foot. Salzberger testified the cause of Swaim's death was homicidal violence, including strangulation and blunt force injury, and the manner of death was homicide. Bailey testified he saw none of the injuries to Swaim's body shown in autopsy photographs when he found her deceased the morning of February 7, 2013.

Witnesses at trial testified to the tumultuous and physical nature of Bailey and Swaim's relationship. Watkins testified concerning three incidents in which Swaim came to his trailer after she and Bailey had argued. Ceclia Howe testified that in the year she lived across the street from Bailey and Swaim's trailer, she was aware Bailey and Swaim argued often. She could hear Bailey screaming in the middle of the street at Swaim, and she heard loud sounds in the trailer like someone screaming at someone else. In one incident, she saw Bailey grasping Swaim, who was pregnant, by her hair; it appeared Bailey was trying to drag Swaim into their trailer. Howe

–4–

testified she had seen Swaim with a split lip and black and blue marks. She also testified that on two other occasions, Swaim had a black eye. Howe testified she had telephoned the police regarding Bailey's screaming and she had yelled at Bailey to "shut up."

Nicole Barker, who lived next door to Bailey and Swaim for over a year, testified she had heard Swaim screaming, Bailey and Swaim fighting, and Bailey calling Swaim terrible names. She could hear crashing and banging in Bailey and Swaim's trailer, and could hear what sounded like them running from one end of the trailer to the other. According to her testimony, Bailey and Swaim sometimes argued outside their trailer. Nicole Barker had not seen bruising or marks on Swaim. She testified she had called the police regarding Bailey and Swaim several times and that when the police knocked on the door of Bailey and Swaim's trailer, there would be silence.

Joe Barker, Nicole Barker's husband, testified he had heard Bailey and Swaim screaming, yelling, and slamming doors. On one occasion, he heard Bailey and Swaim arguing outside. When he went outside and asked if anything was wrong, Swaim said she was fine and walked away, and Bailey went inside their trailer. Joe Barker never saw any bruising on Swaim.

Stephanie Reynolds, a former girlfriend and mother of Bailey's two oldest children, testified that at one time, she, Bailey, and Swaim had a "plural" relationship. According to Reynolds, when Bailey drank alcohol, he became possessive and paranoid and got into arguments. Reynolds testified regarding a December 2009 incident in Garland, Texas. Reynolds, Bailey, and Swaim had been taking drugs and drinking. Bailey punched and choked Swaim and punched Reynolds in the eye. After Reynolds contacted the police, Bailey was arrested on an outstanding warrant. Reynolds sustained a black eye, and Swaim's face was red and swollen, and she had marks from choking as well as marks on her arms. Reynolds telephoned her uncle, Avin Payne, Jr., to come pick her up, and she then went to North Carolina.

Reynolds testified Bailey had threatened her that if she ever left him, he would kill her, their children, and himself.

Payne testified that Reynolds phoned him to come and get her after the 2009 incident in a Garland, Texas, motel room, and he picked up both Reynolds and Swaim. At that time, Payne observed that Swaim and Reynolds each had bruises. Swaim had a black eye and swollen nose; Reynolds had bruises to her cheek, hand prints on her arms, and bruises on her body.

Bailey testified about his relationship with Swaim and action taken by Child Protective Services (CPS) that resulted in the loss of custody of their children, L.B. and A.B. He testified he had a "plural" relationship with Swaim and Reynolds that ended when Reynolds returned to North Carolina and he was arrested on an outstanding warrant after the December 2009 incident at the Garland, Texas motel. Bailey testified that during the evening in December 2009 he spent with Swaim and Reynolds in the Garland motel room, they were using drugs, and he "guess[ed] you could say [he] assaulted [Swaim]." Although he did not remember events as a result of the drugs he had taken, Swaim told him he "head butted" her, and he admitted it because she said he had done it. Bailey and Reynolds' children were in the room when the incident occurred.

Bailey indicated that in the summer of 2010, he was driving a car in Denison, Texas in which Swaim and the children of Bailey and Reynolds were passengers. Swaim began kicking him and Bailey pulled the car over to the side of the road and asked Swaim to get out of the car. When she refused, Bailey reached over her, opened the passenger door, nudged her out, and drove away.

Later, in February 2011, Bailey and Swaim were "coming down off of drugs." He was leaving with L.B. and as he was putting her in a car seat, Swaim was swinging at him and her hand came in contact with L.B.'s face. Bailey's father called the police who arrested both Bailey and Swaim. Swaim tested positive for drugs, and in the fall of 2011, CPS took L.B. into its

custody. Swaim entered in-patient rehabilitation for drugs in April 2011. L.B. was returned to Bailey and Swaim's possession in January 2013.

During the time they lost custody of L.B., Swaim became pregnant with A.B. Bailey testified that "a couple of months" after A.B. was born in February 2012, he and Swaim were involved with drugs, and CPS took custody of A.B. Bailey indicated that thereafter they stopped using drugs. After A.B. was removed from their home, however, he and Swaim drank too much alcohol. Bailey testified about an October 2012 incident resulting in Swaim sustaining a cut and scrape over her right eye. Bailey indicated he was asleep when he heard Swaim yelling, and he discovered that she had tripped and fallen. Bailey testified that when they drank, they would occasionally get into arguments. Bailey testified that on the night of February 6, 2013, he and Swaim were "off the charts drunk" from consuming vodka.

With regard to Watkins's testimony that Swaim came to his trailer on three occasions, Bailey testified Swaim had left their trailer and spent the night at Watkins's trailer on two occasions when Bailey and Swaim were intoxicated. Bailey testified that on the occasions when Swaim went to Watkins's trailer, there had been no physical altercation between them. With regard to testimony of neighbors regarding injuries and bruises they had observed on Swaim during 2011 and 2012, he testified he had not injured Swaim and she was not the type "to let somebody just whoop up on her." Bailey testified he had never spoken to Howe, and Howe had never communicated with him. According to Bailey, the police had never come to the trailer for the purpose of investigating domestic violence. There was one occasion when police came to their trailer and knocked on the door, but Bailey and Swaim did not answer the door because Bailey had an outstanding ticket.

The jury found Bailey guilty of murder and assessed punishment of life imprisonment and a fine of $10,000. Bailey's motion for new trial was denied, and he filed this appeal.

**Mid-Trial Publicity**

In his first point of error, Bailey contends he was denied a fair trial due to publicity about the case that occurred during the course of the trial. Bailey's argument is based upon a newspaper article about his trial that is not in the appellate record. Bailey states in his appellate brief that the article appeared in a local newspaper on the last day of his trial. The State responds that this issue was not preserved, as it was not raised in Bailey's motion for new trial, and lacks merit.

The stated basis for Bailey's motion for new trial was that the verdict is contrary to the law and the evidence. Nowhere in his motion for new trial did Bailey complain regarding purported jury misconduct in reviewing a newspaper article or prejudice as a result of a juror or jurors reviewing a newspaper article. On appeal, Bailey states his trial counsel "attempted to raise this issue" at the hearing of his motion for new trial, but there is no evidence in the record to support such an assertion. We have reviewed Bailey's motion for new trial and the record on appeal, and have concluded this complaint was not presented to the trial court.

To preserve most issues for appellate review, a party must bring the issue to the trial court's attention by timely request, objection, or motion. *See* TEX. R. APP. P. 33.1(a) (preservation of complaint for appellate review requires complaint to trial court by timely request, objection, or motion with sufficient specificity to make trial court aware of complaint, unless specific grounds are apparent from context). Because Bailey did not present the complaint in this point of error to the trial court, he has not preserved this issue for appellate review. *See id.*

Even if Bailey had preserved his issue for review, we cannot conclude this complaint has merit. The record contains no motion by Bailey to sequester the jury to minimize its exposure to publicity concerning the trial. *See* TEX. CODE CRIM. PROC. ANN. art. 35.23 (West 2006). The

trial court specifically instructed the jury not to look at media coverage of the trial. *See id.* (in any case in which the jury is permitted to separate, the court shall first give the jurors proper instructions with regard to their conduct as jurors when so separated). The record contains the trial court's admonishments to the jury that during the pendency of the trial they were not to watch television coverage, read newspaper articles, or speak to individuals regarding what those individuals may have seen on television or read in newspapers regarding the trial. *See Hice v. State*, 491 S.W.2d 910, 911 (Tex. Crim. App. 1973).

No evidence that any juror violated these instructions was introduced in connection with Bailey's motion for a new trial. *See Brimage v. State*, 918 S.W.2d 466, 509 (Tex. Crim. App. 1994) (op. on reh'g). There is no showing in the record that any juror read the newspaper article referenced in Bailey's appellate brief. There is no evidence any juror who served on the case was not fair, impartial and unprejudiced or that any juror, from reading a newspaper article regarding the trial during the pendency of the trial, formed an opinion as to Bailey's guilt or innocence which would or did influence the juror in arriving at a verdict. *See Gonzales v. State*, 501 S.W.2d 644, 646 (Tex. Crim. App. 1973) (no showing of injury or prejudice was made where no evidence juror who read newspaper article, which mentioned both the trial and another charge pending against the defendant, discussed article with other jurors, and juror denied such a discussion). We cannot conclude Bailey has shown he was injured or prejudiced by the newspaper article referred to in his brief. *See Hice*, 491 S.W.2d at 911; *see also Broussard v. State*, 505 S.W.2d 282, 284 (Tex. Crim. App. 1974) ("While it is the better practice that the jury during the trial of the case be told not to listen to or view accounts of the trial, such becomes reversible error only when the accused is injured or prejudiced thereby.") (citing *Banner v. State*, 255 S.W.2d 975, 976 (Tex. Crim. App. 1950)); *Flores v. State*, 472 S.W.2d 146, 149 (Tex. Crim. App. 1971) (even if it had been shown juror read part of newspaper article referring to appellant

as being tried as habitual criminal, appellant would have to show it operated to injure or prejudice him).

We conclude Bailey waived his complaint on appeal that he was denied a fair trial due to mid-trial publicity. Even if this complaint had been preserved, Bailey failed to show mid-trial publicity injured or prejudiced him or that the trial court abused its discretion in denying his motion for new trial. *See Salazar v. State*, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001) (standard of review for denial of motion for new trial is abuse of discretion). We resolve Bailey's first point of error against him.

### Autopsy Photographs

During Salzberger's testimony, the trial court admitted in evidence forty-one color[5] photographs taken in conjunction with the Swaim autopsy. Bailey did not object to admission of eleven of these photographs. In his second point of error, Bailey argues the trial court abused its discretion in admitting the autopsy photographs to which he objected. Bailey contends the "gruesome" autopsy photographs of Swaim "only served to impassion the jury against" him. The State responds to Bailey's contention that the photographs were inflammatory by pointing out that Bailey does not contend the photographs were not necessary to describe the injuries to Swaim or that the trial court did not engage in the required balancing process under rule 403 of the rules of evidence.

Under Rule 403, all relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." TEX. R. EVID. 403. Rule 403 requires that a proffered photograph possess some probative value and that its inflammatory nature does not substantially outweigh that probative value. *Williams*

---

[5] The photographs admitted at trial were in color; the copies of the photographs in our record are in black and white.

*v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006).

In determining a rule 403 objection, the trial court must "consider the inherent tendency that the evidence may have to encourage resolution of material issues on an inappropriate emotional basis." *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992) (internal quotations and alterations omitted). The trial court must then balance that inherent tendency, if any, against "the host of factors affecting probativeness, including the relative weight of the evidence and the degree to which its proponent might be disadvantaged without it." *Id.* Similarly, our review on appeal is limited "to determining whether the probative value of the photos is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996). When we address a complaint that exhibits are inflammatory and gruesome, we must determine whether the trial court abused its discretion when it balanced the following six factors:

> (1) The inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

"A judge's ruling on a Rule 403 objection will be reversed only for a 'clear abuse of discretion.'" *Matamoros v. State*, 901 S.W.2d 470, 476 (Tex. Crim. App. 1995) (quoting *Montgomery v. State*, 810 S.W.2d 372, 392 (Tex. Crim. App. 1991)). "So long as the trial court's ruling is within the zone of reasonable disagreement, it will be upheld." *Id.*

–11–

Salzberger testified the autopsy photographs depict the condition of Swaim's body and cause of her death. She further testified the photographs would aid the jury by explaining the injuries Swaim received and the various procedures Salzberger performed in determining the cause of Swaim's death. A medical examiner is entitled to use autopsy photographs to explain her findings related to manner of death, cause of death, time of death, and the number of wounds sustained by a victim. *Long v. State*, 823 S.W.2d 259, 274 (Tex. Crim. App. 1991). "If there are elements of a photograph that are genuinely helpful to the jury in making its decision, the photograph is inadmissible only if the emotional and prejudicial aspects substantially outweigh the helpful aspects." *Erazo v. State*, 144 S.W.3d 487, 491–92 (Tex. Crim. App. 2004). It is oftentimes the case that photographs can help jurors better grasp the testimony of a medical expert. *See Ladner v. State*, 868 S.W.2d 417, 426 (Tex. App.—Tyler 1993, pet. ref'd).

On appeal, Bailey complains specifically about the autopsy photographs showing internal injuries to Swaim's organs and tissue in her chest, neck, throat, tongue, head, and pubic area as exposed through the autopsy. "Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself" because of the concern "that the jury might attribute certain injuries caused by the autopsy to the appellant." *Salazar*, 38 S.W.3d at 151 (quoting *Rojas v. State*, 986 S.W.2d 241, 249 (Tex. Crim. App. 1998)); *see also Williams*, 301 S.W.3d at 690. Here, the referenced autopsy photographs depicted injuries Swaim sustained prior to the autopsy, not caused by the autopsy process. With reference to the photographs, Salzberger testified about the depth of the injuries, internal bleeding that occurred from the injuries, and bruising of the tongue and damage to the voice box that can be caused by strangulation. The photographs Bailey specifically references showed injuries not detectable except through autopsy. Reviewing Salzberger's testimony in conjunction with the autopsy photographs, it is unlikely the jury attributed "injuries" caused by the autopsy process to Bailey.

Bailey argues that "furthermore," the autopsy photographs depicted Swaim's nude body. Whether the body is clothed is only one consideration when determining whether unfair prejudice substantially outweighs the probative value of evidence. *See Shuffield*, 189 S.W.3d at 787. The evidence at trial was that when Swaim's body was found, she was wearing only a t-shirt and was otherwise naked. The photographs of her body were, aside from having the t-shirt removed, in the state in which she was found. Further, other than bruising and scrapes on Swaim's face and hands, many of the external bruises and abrasions shown on the autopsy photographs and subject of Salzberger's testimony would not have been visible had Swaim been clothed. Moreover, the focus of the photographs was not that Swaim's body was unclothed; the focus of the photographs was clinical in nature.[6] Under the first *Gigliobianco* factor, the trial court reasonably could have determined the photographs had probative value because they accurately depicted Swaim's body and would assist the jury to understand the extent of the injuries, the cause of death, and the manner of death. *See Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995) (when "power of the visible evidence emanates from nothing more than what the defendant has himself done," trial court has not abused its discretion "merely because it admitted the evidence").

The second *Gigliobianco* factor requires us to consider the State's need for the evidence. To assess this factor, a trial court must answer the following questions: "Does the proponent have other available evidence to establish the fact of consequence that the [photographs] are relevant to show? . . . And is the fact or consequence related to an issue that is in dispute?" *Montgomery*, 810 S.W.2d at 390. The cause and manner of Swaim's death were contested issues at trial. The autopsy photographs illustrated the medical examiner's explanation of the various

---

[6] *See Cole v. State*, No. AP-76703, 2014 WL 2807710, at *27 (Tex. Crim. App. June 18, 2014) (not designated for publication) (although deceased's body was shown unclothed in autopsy photograph, that was not focus of the photograph, which was overwhelmingly clinical in nature), *cert. denied*, 135 S. Ct. 1154 (2015).

wounds and injuries. *See Harris v. State*, 661 S.W.2d 106, 107–08 (Tex. Crim. App. 1983) (admitting photographs that help jury understand doctor's technical language used to describe the victim's injuries is not abuse of discretion). How Swaim died and the manner of her death were facts of consequence. *See Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999) (gruesome photographs that depicted "disagreeable realities" of the brutal offense were powerful visual evidence, probative of various aspects of the State's case). The State needed the photographs to depict: that Swaim was bruised over the length of her body and sustained injuries in locations not suggestive of a fall and with severity not suggestive of a fall from other than a significant height; defensive wounds; and injuries suggestive of strangulation. The State did not have evidence other than the photographs from which the jurors could form a mental visual image of these facts of consequence. Under the second *Gigliobianco* factor, the trial court reasonably could have determined that, based on the State's need for the evidence to establish facts of consequence related to issues in dispute, the probative value of the photographs outweighed any unfair prejudice. *See Montgomery*, 810 S.W.2d at 389–90.

With regard to the third *Gigliobianco* factor, we must consider whether the photographs would suggest a decision by the jury on an improper basis. *Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007). Unfair prejudice does not arise from the mere fact that evidence injures a party's case. Virtually all evidence that a party offers will be prejudicial to the opponent's case. *Id*. Evidence is unfairly prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove a fact or issue that justifies its admission into evidence. *Id*. In this case, the autopsy photographs were no doubt prejudicial to appellant, and the photographs could have generated an emotional response, however, the trial court reasonably could have concluded the autopsy photographs related directly to the injuries sustained by Swaim that

–14–

resulted in the charged offense, and therefore did not have a tendency to suggest decision-making by the jury on an improper basis. *See Gigliobianco*, 210 S.W.3d at 641.

The fourth *Gigliobianco* factor requires that we analyze any tendency of the photographs to confuse or distract the jury from the main issues in the case. *Id*. The autopsy photographs in this case related directly to the cause and manner of Swaim's death and the charged offense of murder; the photographs did not tend to prove some adverse fact not properly in issue or unfairly excite emotions against appellant. *See Casey*, 215 S.W.3d at 883. Accordingly, the trial court reasonably could have concluded the evidence did not have a tendency to confuse or distract the jury from the main issues of the case. *See Gigliobianco*, 210 S.W.3d at 642 (quoting *State v. Mechler*, 153 S.W.3d 435, 441 (Tex. Crim. App. 2005)).

With regard to the fifth *Gigliobianco* factor, there is no suggestion or evidence in the record that the photographs were given undue weight by a jury that had not been equipped to evaluate the probative force of the evidence. *See id*. at 641. To the contrary, Salzberger's testimony regarding what the photographs depicted and how the photographs assisted her in making her determinations of the cause and manner of Swaim's death, provided the jury a firm basis for evaluating the probative force of the evidence. *See Ladd v. State*, 3 S.W.3d 547, 568 (Tex. Crim. App. 1999) (photographs from crime scene and autopsy were plainly probative of the manner of victim's death). We cannot conclude that the complained-of photographs are "so horrifying or appalling that a juror of normal sensitivity would necessarily encounter difficulty rationally deciding the critical issues of this case after viewing them." *See Fuller v. State*, 829 S.W.2d 191, 206 (Tex. Crim. App. 1992), *abrogated on other grounds by Castillo v. State*, 913 S.W.2d 529, 534 (Tex. Crim. App. 1995).

In considering the rule of evidence 403 factors of undue delay or needless presentation of cumulative evidence and the sixth *Gigliobianco* factor of the likelihood that presentation of the

evidence will consume an inordinate amount of time or merely repeat evidence already admitted, we note that Bailey objected at trial to the autopsy photographs as duplicative and prejudicial. *See* TEX. R. EVID. 403; *Gigliobianco*, 210 S.W.3d at 641–42. However, he does not argue on appeal that the photographs were cumulative. Outside the presence of the jury, Salzberger testified about a photograph she did not need and the trial court excluded that photograph and another photograph as duplicative. After comparing the photographs and the different perspectives shown in the photographs regarding the nature and severity of Swaim's injuries, the cause of her death, and the manner of her death, the objected-to photographs did not "merely repeat evidence already admitted." *See Gigliobianco*, 210 S.W.3d at 641–42; *Etheridge v. State*, 903 S.W.2d 1, 21 (Tex. Crim. App. 1994) (concluding photographs from crime scene and autopsy were not cumulative because autopsy photographs more clearly illustrated full extent of injuries and general condition of the body). Further, it does not appear from the record that presentation of the evidence consumed an inordinate amount of time.

The rule 403 factors, as applied in *Gigliobianco*, weigh in favor of admission of the complained-of photographs. To the extent the photographs may be disturbing, it is because of the pervasive nature and severity of the injuries Swaim sustained. Because the photographs and related testimony supported the State's theory of the case and enhanced the jury's comprehension of the factual basis for that case, we cannot conclude that the trial court clearly abused its discretion in determining the probative value of the photographs outweighed any risk of unfair prejudice they might engender. *See Frank v. State*, 183 S.W.3d 63, 78 (Tex. App.—Fort Worth 2005, pet. ref'd) ("Photographs that depict the nature, location, and extent of a wound have been declared probative enough to outweigh any prejudicial effect."). Because we discern no clear abuse of discretion in admission of the autopsy photographs in evidence, we resolve Bailey's second point of error against him.

**Prior Bad Acts**

In his third point of error, Bailey asserts the trial court abused its discretion in admitting evidence of his prior bad acts in relation to Swaim and former girlfriends. However, Bailey seems to restrict his argument to the contention that through six witnesses, the jury heard testimony of a prior "negative relationship" between Bailey and Swaim and that admission of this evidence resulted in him "being tried not only for the State's pleading of murder, but also for being a criminal in general." Specifically, Bailey references the testimony of: Watkins regarding two prior incidents of "bad conduct"; Howe, Nicole Barker, and Joe Barker regarding "improper conduct" between Bailey and Swaim; Reynolds regarding a prior assault on her and Swaim by Bailey; and Payne regarding visible manifestations of Bailey's assault on Swaim and Reynolds.[7] Bailey argues that such evidence of his prior wrongs was admitted only to prove his character and that he acted in conformity therewith. Therefore, he asserts the trial court abused its discretion in overruling his rule of evidence 404(b) objection to the "plethora" of his prior bad acts.[8]

The State responds the trial court properly found the prior incidents illustrated important aspects of the relationship between Bailey and Swaim, and that relationship necessarily implicates many of the exceptions listed in rule 404(b). The State asserts the trial court could have reasonably determined the probative value of the evidence was not substantially

---

[7] As indicated later in this opinion, Bailey objected at trial only to the testimony of Watkins and Howe. The testimony of Nicole Barker, Joe Barker, Reynolds, and Payne about which Bailey complains (*i.e.*, testimony concerning the arguments between Bailey and Swaim and the physical aspects of those confrontations) was admitted at trial without objection.

[8] Rule of evidence 404(b) provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.

TEX. R. EVID.404(b).

–17–

outweighed by the danger of unfair prejudice, and the trial court did not abuse its discretion in admitting evidence of extraneous acts relevant to prove Bailey's motive and intent in the context of Bailey and Swaim's complex relationship.

A defendant "is to be tried only on the crimes alleged in the indictment and not for being a criminal generally." *Abdnor v. State*, 871 S.W.2d 726, 738 (Tex. Crim. App. 1994). "Thus, evidence of extraneous offenses or bad acts committed by the defendant may not be introduced during the guilt/innocence portion of the trial to show the defendant acted in conformity with his criminal nature." *Id.* "Nonetheless, evidence of extraneous offenses is admissible for a limited purpose where such evidence is material and relevant to a contested issue in the case." *Id.*; *see also* TEX. R. EVID. 404(b); *Lockhart v. State*, 847 S.W.2d 568, 571 (Tex. Crim. App. 1992) (evidence of extraneous offenses may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident").

"When extraneous offenses are admitted for a limited purpose, the defendant is entitled, on timely request, to an instruction by the trial judge to the jury limiting the jury's consideration of the extraneous offenses to those purposes for which they are admitted." *Abdnor*, 871 S.W.2d at 738. Bailey acknowledges the trial court's charge instructed the jury regarding extraneous offenses. The guilt/innocence jury charge included the following instruction regarding evidence of extraneous bad acts:

> The State has introduced evidence of extraneous crimes or bad acts other than the one charged in the indictment in this case. This evidence was admitted only for the purpose of assisting you, if it does, for the purpose of showing the previous relationship existing between Sarah Swaim and the defendant and the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident if any. You cannot consider the testimony unless you find and believe beyond a reasonable doubt that the defendant committed these acts, if any, were committed [sic] and then only for the limited purpose indicated above.

Pursuant to article 38.36 of the code of criminal procedure, the State sought to elicit testimony regarding Bailey and Swaim's relationship prior to Swaim's February 2013 death. In

–18–

particular, the State sought to elicit testimony from Watkins regarding Swaim going to Watkins's trailer following arguments with Bailey and testimony from Howe regarding arguments between Bailey and Swaim and seeing Bailey assault Swaim outside their trailer. Bailey objected that the testimony would be more prejudicial than probative.

Article 38.36 of the code of criminal procedure provides in all prosecutions for murder, the State or the defendant "shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased . . . ." TEX. CODE CRIM. PROC. ANN. art. 38.36(a) (West 2005). In some situations, prior acts of violence between the victim and accused may be offered to illustrate the nature of the relationship. *Garcia v. State*, 201 S.W.3d 695, 702 (Tex. Crim. App. 2006). "These specific acts of violence must meet the requirements of the Rules of Evidence in order to be admissible." *Id*. Rule 404(b) deals with prior acts of violence and specifically instructs courts regarding admissibility of such evidence. *See* TEX. R. EVID. 404(b). "[A]lthough rules [of evidence] 403 and 404 limit the admissibility of some article 38.36(a) relationship evidence, this does not mean that the statute and the rules are in conflict with each other." *Garcia*, 201 S.W.3d at 703. It means that the State is prohibited from presenting evidence if the probative value is substantially outweighed by unfair prejudice, or "for the sole purpose of showing that the accused acted in conformity with his bad character and murdered the victim." *Id*. "While Rule 404(b) limits the admissibility of specific acts used to show only the defendant's character, and may keep a prosecutor from trying the case not on the charged offense but on the past acts of the accused, it certainly does not block the admission of all relationship evidence." *Id*. "For example, in cases in which the prior relationship between the victim and the accused is a material issue, illustrating the nature of the relationship may be the purpose for which evidence of prior bad acts will be admissible." *Id*. "What issues are material will depend on the theories of the

prosecution and the defense." *Smith v. State*, 5 S.W.3d 673, 679 n.13 (Tex. Crim. App. 1993) (citing *Fielder v. State*, 756 S.W.2d 309, 318 (Tex. Crim. App. 1988)).

Here, the trial court stated the State's proffered testimony of Watkins and Howe concerned the previous relationship between Bailey and Swaim and overruled Bailey's objection to that testimony. The testimony was not offered for the sole purpose of showing Bailey had a violent character and acted in conformity with that character in murdering Swaim. Rather, the relationship between Bailey and Swaim was itself a material issue. The circumstances surrounding the relationship of Bailey and Swaim at the time of Swaim's death is relevant evidence under article 38.36(a), and the testimony of Watkins and Howe regarding the arguments between Bailey and Swaim and the physicality associated with their arguments is admissible under rule of evidence 404(b) for the purpose of illustrating the nature of their relationship. *See Garcia*, 201 S.W.3d at 704.

In determining whether evidence is admissible under rule 403, we do not consider just whether the evidence is more prejudicial than probative. We consider whether the probative value is *substantially* outweighed by the danger of *unfair* prejudice. *Robbins v. State*, 88 S.W.3d 256, 262 (Tex. Crim. App. 2002). The purpose in excluding relevant evidence under rule 403 is to prevent a jury that has a reasonable doubt of the defendant's guilt of the charged offense from convicting him anyway based solely on his criminal disposition or because he is generally a bad person. *Id*. at 263. On this record, there is no reason for us to believe that the jury had reasonable doubt that Bailey murdered Swaim but convicted him anyway based on the evidence of his relationship with Swaim and events regarding the frequency and severity of their arguments as evidenced by Watkins's and Howe's testimony. *See Garcia*, 201 S.W.3d at 704. The evidence Bailey assaulted or injured Swaim in the past was no more inflammatory or prejudicial than evidence he beat her on the night of the murder. The evidence was probative of

the relationship between Bailey and Swaim, and the nature of their relationship was related to the material issue of whether Bailey murdered Swaim. Finally, any potential prejudice was diminished by the trial court's limiting instruction in the jury charge. We cannot conclude the trial court abused its discretion in admitting the objected-to testimony of Watkins and Howe.

Further, error, if any, in admitting Watkins's and Howe's testimony, ny error was harmless. Bailey objected at trial only to the testimony of Watkins and Howe. The testimony of Nicole Barker, Joe Barker, Reynolds, and Payne regarding the arguments between Bailey and Swaim and the physical aspects of those confrontations was admitted without objection. *See* TEX. R. APP. P. 33.1(a) (to preserve complaint for appellate review, the record must show a specific and timely complaint was made to the trial judge and that the trial judge ruled on the complaint); *see also Lovill v. State*, 319 S.W.3d 687, 691 (Tex. Crim. App. 2009). Nicole Barker testified that in the period of over a year before Swaim's death, she heard Swaim screaming and Bailey and Swaim fighting inside and outside their trailer. She testified she had called the police several times regarding the conduct of Bailey and Swaim. Joe Barker testified he, too, had heard Bailey and Swaim arguing, including one occasion in which they argued outside their trailer. Reynolds testified regarding injuries she and Swaim sustained when Bailey physically assaulted them in December 2009, and Payne testified to the injuries Swaim and Reynolds sustained in that December 2009 assault by Bailey.

It is well-established that "erroneously admitting evidence 'will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.'" *Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010) (quoting *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)); *see also Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010) (noting any error in admission of evidence was harmless in light of "very similar" evidence admitted without objection). In other words, error in the

–21–

admission of evidence may be rendered harmless when "substantially the same evidence" is admitted elsewhere without objection. *Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991). Therefore, error, if any, in admitting Watkins's and Howe's testimony was harmless when substantially the same evidence regarding Bailey's "prior bad acts in relation to" Swaim and Reynolds was admitted without objection in the testimony of Nicole Barker, Joe Barker, Reynolds, and Payne.

We resolve Bailey's third point of error against him.

## Conclusion

Having ruled against Bailey on his points of error, we affirm the trial court's judgment.

/Robert M. Fillmore/

ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

131536F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

GREGORY SHANE BAILEY, Appellant

No. 05-13-01536-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 15th Judicial District
Court, Grayson County, Texas
Trial Court Cause No. 062872.
Opinion delivered by Justice Fillmore,
Justices Schenck and Thomas participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 13th day of April, 2015.