

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

## No. 02-18-00483-CR

———————————————————

CHAD MICHAEL FERNANDEZ, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1550055R

---

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant Chad Michael Fernandez appeals his conviction and fifteen-year sentence for stalking.[1]  In four points, Fernandez argues that (1) the trial court abused its discretion by allowing the State's expert witness to testify about domestic violence in general and how those generalizations applied to the facts of this case, (2) the State's expert's testimony was more prejudicial than probative, (3) the stalking statute is facially unconstitutional, and (4) because the stalking statute is facially unconstitutional, this court should remand this case for a new trial.[2]  We affirm.

### II. BACKGROUND

Fernandez and the complainant in this case, Daisy Leza, began dating in November 2015 after meeting on Match.com.  The relationship was tumultuous, and in mid-July 2016, Leza broke off the relationship.  Fernandez began to leave angry and threatening voicemails on Leza's phone.  Leza eventually blocked Fernandez's number and began to periodically stay with relatives in order to avoid contact with him.  At trial, Leza testified that the couple's relationship had a pattern wherein Fernandez would do or say something that disturbed Leza, she would break off the relationship, but Fernandez would continue to communicate with her until she agreed

---

[1]*See* Tex. Penal Code Ann. § 42.072(a)(1)(B).

[2]Fernandez originally filed a brief with two points, but in his reply brief he brought forth two more points, which he labeled "supplemental."  For ease of reading, we have labeled them points one through four.

to go out with him again. Following that pattern, in late July 2016, Leza and Fernandez celebrated Fernandez's birthday together in Dallas. Soon thereafter, Leza again broke off the relationship.

Around 4:00 a.m. in mid-August 2016, Fernandez entered Leza's backyard and knocked on her bedroom window. In an effort to keep Fernandez from coming to her house again, Leza agreed to unblock Fernandez's phone number to allow him to communicate with her. Over the next few weeks, Fernandez would follow Leza in her car, show up at her house uninvited with gifts, and persistently call her. At this point, Leza permanently moved in with her parents to avoid him.

Leza told Fernandez that she wanted him to leave her alone, but he continued to call her so she again blocked his phone number. However, Fernandez would use other phones to contact Leza, so she obtained a new phone number in early September 2016. A few days later, Leza saw Fernandez in the employee parking lot of her work. Later that same day, Fernandez went into the reception area of Leza's work. When security guards talked with him, he said that he was there to see Leza, but the guards told him to leave. According to Leza, security guards began to escort her to her vehicle when she would leave work until she was given a space in a secured lot.

On September 28, 2016, Leza went on her lunch break, and as she approached her parent's neighborhood, a vehicle started swerving close to hers and then drove in front of her, blocking her from moving. It was Fernandez, who got out of his vehicle

3

and approached Leza's vehicle. Scared, Leza rolled down her window slightly, and after Fernandez pleaded with her to communicate with him, Leza gave Fernandez her new email account. From there, Fernandez sent several threatening emails,[3] so Leza blocked his email address.

Undeterred, Fernandez began to frequently drive around the perimeter of her work. He also confronted her outside of a yoga class she had attended. In an attempt to appease Fernandez, Leza unblocked his email. Fernandez again began to send threatening emails, including threats to kill anyone who attempted to date her.

On November 11, 2016, after returning from a trip, Leza stopped by her house to pick up some things. She found flowers and letters from Fernandez in her mailbox. While inside her house, she heard a knock on her back window. After looking outside and seeing Fernandez's truck, she called the police. The police issued Fernandez a criminal trespass warning and advised Fernandez to no longer contact Leza. But Fernandez again sent numerous threatening emails,[4] and on November 15, 2016, after obtaining an arrest warrant, police arrested Fernandez.[5]

---

[3]The State introduced more than 260 exhibits chronicling Fernandez's texts, emails, and uninvited encounters with Leza, as well as interactions with police regarding Fernandez's persistence to communicate with her. For example, one email that Fernandez sent to Leza stated, "It's time now so grip hold of what[ever because] I'm coming now. I'll be right there at you[r] f*****g lowest so get ready [because] I'm coming."

[4]For an example of the threatening nature of Fernandez's emails, in one email he stated, "I'm at your work now . . . . YOU CAN'T AVOID ME AND IF YOU THINK COPS CAN OR WHATEVER I'LL JUST SEND ANOTHER MAN OR

At trial, the State called Lacy Hensley as a domestic-violence expert witness. After conducting a Rule 705 hearing,[6] the trial court allowed Hensley, director of intake and client services at One Safe Place,[7] to testify before the jury. Hensley averred that she has extensive experience regarding domestic violence and stalking behavior. According to Hensley, she had collected eighteen months of data covering more than 1,400 clients during the years of 2017 and 2018 at One Safe Place, and 78% of the clients had reported some form of electronic stalking via email, messaging, or unwanted phone calls. Hensley also said that the overarching umbrella of "domestic violence" includes emotional abuse or abuse through communication alone.

---

AN[]OTHER PERSON TO GET YOU TO REA[L]IZE [BECAUSE] I AM FOR[]EVER."

[5]The State introduced video from an officer's body camera showing Fernandez fleeing from police when they went to his house to arrest him. Moments later, the police were able to subdue Fernandez without a struggle.

[6]Texas Rule of Evidence 705(c) governs the reliability of expert testimony. Tex. R. Evid. 705(c). The rule states that "[a]n expert's opinion is inadmissible if the underlying facts or data do not provide a sufficient basis for the opinion." *Id.* The proponent of the expert must establish some foundation for the reliability of the expert's opinion, and this is done through a hearing before the trial court. *Vela v. State*, 209 S.W.3d 128, 136 (Tex. Crim. App. 2006).

[7]On its website, One Safe Place describes itself as a 501(C)(3) organization that serves as "a comprehensive crime prevention agency devoted to preventing crime and violence in Tarrant County's neighborhoods, schools[,] and homes." One Safe Place, https://www.onesafeplace.org/ (last visited March 2, 2020). Hensley testified that she works for a division of One Safe Place known as the Family Justice Center, which she described as a partnership of about twenty agencies that "provide one location for people experiencing intimate partner and/or family violence."

Hensley went on to explain the "Power and Control wheel," an educational tool used by domestic-abuse counselors to help explain to victims the cycle of domestic abuse. As she explained the Power and Control wheel, the State introduced a visual aid that Hensley had brought with her that she described as "a visual representation [designed] to help explain the types of behaviors that happen in an abusive relationship." Even though the visual aid has the words "physical" and "sexual violence" prominently displayed on its outer circle, Hensley said that domestic violence is "not just physical and sexual violence like we typically think of, there are many other types of abuse that also occur in those relationships, and the top eight are listed inside of the wheel." Specifically, Hensley pointed out the top eight that were listed on the visual aid: coercion and threats; intimidation; emotional abuse; isolation; minimizing, denying, and blaming; using children; economic abuse; and male privilege. After expressing these eight categories, Hensley again emphasized how domestic abuse "doesn't have to be physical or sexual abuse."

Hensley then testified that another tool used by domestic-abuse counselors is the "cycle of violence" and that there are three distinct phases of domestic abuse: tension building, an abusive incident, and a honeymoon phase. Like she did when describing the Power and Control wheel, Hensley repeatedly stated that an "abusive incident" does not have to be physical and includes incidents of verbal and emotional abuse. She also said that people can be in fear or put in fear for their life or livelihood through words alone.

Hensley testified that she had read some of the emails and texts that Fernandez had sent to Leza, although she had not met with either of them personally. Hensley opined that she could see multiple "cycle[s] of violence throughout the text messages and e-mails" and that these communications could have definitely placed Leza in fear, as general victims of stalking would be. Hensley said that common terms used by domestic abusers like "I'll show you" and "I'll never give up" were found frequently in Fernandez's communications to Leza and that the communications would escalate in tone and frequency if Leza did not communicate back. Hensley also said that she had reviewed emails and messages wherein Fernandez had explained to Leza how he knew her routine schedule[8] and that this would deliver the message to any domestic-abuse victim that the abuser was in control of when and where he might show up.

Hensley explained that it is common in domestic-abuse scenarios for the victim to leave the relationship but to also leave open lines of communication with the abuser and that this communication did not lessen the fear for the victim. She also said that it is not uncommon for a victim to meet with an abuser after leaving in hopes of deescalating stalking behavior or to re-open lines of communication when an abuser begins to show up at locations uninvited. And Hensley stated that when a victim is being repeatedly exposed to stalking behavior, they often live in a constant

---

[8]For example, in one email, Fernandez wrote Leza, "So [you] pick up you[r] mail around 3:30ish and then you either stay there to do yoga or you go to you[r] boyfriend's and parent[']s house. It's always one of those and you skip lunch breaks. . . . Am I getting all this right? How do I know all this while I'm working? That's a secret my friend that [you will] never know and it's best to be untold. Lol."

"what's going to happen next" state of mind. Hensley defined stalking behavior as the totality of the circumstances and not just the individual isolated incidents.

Ultimately, a jury found Fernandez guilty of third-degree felony stalking but found the State's deadly-weapon (a vehicle) allegation not true. After Fernandez pleaded true to the State's repeat-offender notice, the trial court sentenced Fernandez to fifteen years' confinement. This appeal followed.

## III. DISCUSSION

### A. The Admissibility of Hensley's Testimony

In his first point, Fernandez argues that the trial court abused its discretion by allowing Hensley to testify about domestic violence "because it did not assist the jury in deciding an ultimate issue in this case, went beyond the scope of admissible expert testimony, and supplanted the jury's decision." We disagree.

#### 1. Standard of Review

We review the trial court's determination as to the admissibility of expert testimony for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). Expert testimony is admissible when scientific, technical, or other specialized knowledge will assist the factfinder in understanding the evidence or in determining a fact issue. Tex. R. Evid. 702; *Cohn v. State*, 804 S.W.2d 572, 575 (Tex. App.—Houston [14th Dist.] 1991), *aff'd*, 849 S.W.2d 817 (1993). Evidence admissible under Rule 702 may include testimony that compares general or classical behavioral characteristics of a certain type of victim with the specific victim's behavior patterns.

8

*See Duckett v. State*, 797 S.W.2d 906, 917 (Tex. Crim. App. 1990) (holding testimony of expert on whether the reaction of complaining child was similar to the reaction of most victims of child abuse was helpful to the jury in determining if an assault occurred);[9] *Fielder v. State*, 756 S.W.2d 309, 321 (Tex. Crim. App. 1988) (holding that expert testimony aided factfinder when expert explained inconsistency in appellant's behavior consistent with that of typical battered women).

Because the average juror will not typically be familiar with the effect of domestic violence on victims and the dynamics of the relationship between abuser and victim, expert testimony has generally been held to be admissible to explain recantations, delays in reporting, lies to the police, and why a complainant would continue a relationship with an abuser after an alleged assault. *See Salinas v. State*, 426 S.W.3d 318, 323 (Tex. App.—Houston [14th Dist.] 2014) (op. on reh'g), *rev'd on unrelated grounds*, 464 S.W.3d 363 (Tex. Crim. App. 2015); *Dixon v. State*, 244 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd); *Scugoza v. State*, 949 S.W.2d 360, 363 (Tex. App.—San Antonio 1997, no pet.). And the cycle of violence and the Power and Control wheel are generally accepted principles that experts on domestic violence use to explain the general relationship between an abuser and victim. *See Young v. State*, No. 09-17-00374-CR, 2019 WL 1647679, at *2

---

[9]The court of criminal appeals has disapproved of *Duckett*, but only to the extent that it could be read "to hold that even expert testimony that is relevant as substantive evidence may yet be inadmissible unless it serves some rehabilitative function." *Cohn*, 849 S.W.2d at 819.

(Tex. App.—Beaumont Apr. 17, 2019, no pet.) (mem. op., not designated for publication) (holding cycle of violence admissible to explain text messages in which the defendant apologized for his violent actions and the complainant expressed forgiveness and a desire to maintain their relationship and drop criminal charges); *Nwaiwu v. State*, No. 02-17-00053-CR, 2018 WL 3763899, at *3 (Tex. App.—Fort Worth Aug. 9, 2018, pet. ref'd) (mem. op., not designated for publication) (holding expert testimony on the cycle of violence relevant to explain why victim would change her story and testify for the defendant); *see Runels v. State*, No. 03-18-00036-CR, 2018 WL 6381537, at *7 (Tex. App.—Austin Dec. 6, 2018 pet. ref'd) (mem. op., not designated for publication) (holding trial court did not abuse its discretion by admitting expert testimony about the Power and Control wheel when victim continued to communicate with the defendant after offense); *Mendoza v. State*, No. 08-13-00293-CR, 2015 WL 5999596, at *2, *4–5 (Tex. App.—El Paso Oct. 14, 2015, pet. ref'd) (not designated for publication) (holding expert testimony about the Power and Control wheel relevant to assist the jury in understanding domestic-violence victim's actions and statements).

A trial court's admission of expert testimony will rarely be disturbed on appeal; "[b]ecause the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case." *Rodgers v. State*, 205 S.W.3d 525, 527–28 (Tex. Crim. App. 2006). But expert testimony

10

that decides an ultimate fact for the jury, such as a direct opinion on the truthfulness of a witness, crosses the line and is not admissible under Rule 702. *Schutz v. State*, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997).

### 2. Rule 702 and Expert Testimony

The admission of expert testimony is governed by Rule 702 of the Texas Rules of Evidence, which states that a witness who is "qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. Thus, there are three requirements for the admission of expert testimony: (1) the witness qualifies as an expert by reason of her knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will assist the factfinder in deciding the case. *Rhomer*, 569 S.W.3d at 669. These are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Id.*

### 3. The Relevancy of Hensley's Testimony

Here, Fernandez challenges only the relevancy of Hensley's testimony, albeit in three distinct ways. First, Fernandez argues that Hensley's testimony about the cycle of violence "was not sufficiently tied to the facts of this case to constitute relevant expert testimony." Fernandez's first argument under this point alleges that because the cycle of violence has three phases, one of which is the "abusive incident," and

11

because Hensley did not testify to an abusive incident, the facts of this case are not sufficiently tied to the cycle of violence theory. Fernandez's argument is predicated on his notion that an "abusive incident" must be physical in nature, and because there was no physical assault in this case, Hensley should not have been able to testify about the cycle of violence theory. But Fernandez's myopic view of an abusive incident is not supported by the record. Indeed, Hensley repeatedly said that abuse does not have to be physical and that roughly 78% of the clients at One Safe Place had reported non-physical abuse such as threatening or harassing phone calls or messages—the types of abusive incidents that Hensley clearly testified that she identified multiple times in Fernandez's communications to Leza. Fernandez does not cite to any authority that an "abusive incident" must be physical, and his definition is not supported by the record. We overrule this portion of Fernandez's first point.

The second argument that Fernandez makes under this point is that the visual aid that Fernandez used when describing the Power and Control wheel states that "regular use of other abusive behaviors by the batterer, when reinforced by one or more acts of physical violence, make up a larger system of abuse." Thus, Fernandez contends, the Power and Control wheel requires physical violence, and because there is no evidence of physical violence from Fernandez toward Leza in the record, Hensley failed to tie the Power and Control wheel theory to the theory of this case.

12

But Hensley directly testified to the language found on the Power and Control wheel visual aid and acknowledged that the aid states on the "outer circle" physical and sexual abuse, which are types of physical violence. Hensley explained multiple times, however, that "abuse" in general is more far-reaching than physical violence, and she testified that within the inner circle of the Power and Control wheel visual aid were eight different, nonphysical types of abuse. In short, there is no support in the record, nor has Fernandez pointed to any authority to support the argument, that the Power and Control wheel theory requires a physical event. We overrule this portion of Fernandez's first point.

Third and finally, Fernandez argues that Hensley's testimony went beyond comparing Leza's behaviors to general behaviors of domestic abuse victims. Specifically, Fernandez argues that "Hensley's testimony that Fernandez's messages would make Leza fear for her life, feel hopeless that he would never stop, and feel like she did not have a choice went beyond the scope of admissible expert testimony" and that Hensley's testimony "constituted a direct opinion on Leza's truthfulness."[10] This court has reviewed the record, and we disagree with Fernandez that Hensley's

[10]The State argues that Fernandez has failed to preserve this third sub-argument of his first point for our review, contending that Fernandez never made this specific objection during the Rule 705 hearing or later at trial when he requested a running objection. But as can be read in the record of the Rule 705 hearing, Fernandez did object that Hensley would be "testify[ing] as to hearing stories from . . . the victim," and he objected that Hensley would be "curtailing her testimony to what she has heard from this victim." Given these objections, and in the interest of justice, we have addressed this sub-argument.

testimony was specific to Leza and that Hensley gave an opinion regarding Leza's truthfulness. Indeed, the prosecutor who questioned Hensley went to great lengths to keep Hensley's testimony as general as possible, and Hensley's testimony never wavered from a comparison of Leza's behaviors to behaviors that Hensley said she had repeatedly seen in domestic-violence or stalking scenarios in general. We overrule Fernandez's first point in its entirety.

## B. The Probative Versus Prejudicial Effect of Hensley's Testimony

In his second point, Fernandez argues that the trial court erred by allowing Hensley's testimony because the prejudicial effect of the evidence greatly outweighed any probative value, and it was therefore inadmissible under Texas Rules of Evidence Rule 403. Tex. R. Evid. 403. We disagree.

### 1. Standard of Review

We review trial court rulings on the admissibility of evidence for abuse of discretion. *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). A trial court abuses its discretion when its ruling is arbitrary or unreasonable. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). A trial court does not abuse its discretion if its decision is within "the zone of reasonable disagreement." *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008).

### 2. Rule 403

In analyzing a Rule 403 objection, the trial court must engage in a balancing process. *Perez v. State*, 562 S.W.3d 676, 689 (Tex. App.—Fort Worth 2018, pet. ref'd).

When undertaking this analysis, on one end of the scales the court must weigh (1) the inherent probative force of the evidence along with (2) the State's need for the evidence. *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). On the other end, the court weighs (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Id.* at 641–42. Rule 403 carries a presumption that relevant evidence will generally be more probative than problematic. *Wells v. State*, 558 S.W.3d 661, 669 (Tex. App.—Fort Worth 2017, pet. ref'd). Thus, the balance is always slanted toward admission of relevant evidence. *In De La Paz v. State*, 279 S.W.3d 336, 343 & n.17 (Tex. Crim. App. 2009). It was Fernandez's burden to overcome this presumption by demonstrating that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice or other factors. *Wells*, 558 S.W.3d at 669.

### 3. Balancing the Factors in This Case

Here, much like in his first point, Fernandez places the main focus of his objection under Rule 403 on the fact that there was no evidence presented at trial demonstrating that he had physically abused Leza and on his contention that Hensley

15

directly commented upon Leza's veracity.[11]   As discussed above, there is no foundation for Fernandez's contention that testimony regarding the cycle of violence or the Power and Control wheel require a physical component.  And as discussed above, this court finds nothing in the record to support Fernandez's contention that Hensley commented on the veracity of Leza's testimony.  In his brief, Fernandez does not analyze nor attempt to demonstrate how the typical factors considered in a Rule 403 balancing analysis support his contention.  We conclude that the factors weigh in favor of the trial court's decision.

As to the first factor—the inherent probative force of the evidence—Hensley testified regarding domestic violence in general and typical behaviors of victims of domestic violence, including the typical behavior of victims of stalking.  This type of testimony has repeatedly been held to have inherent probative force in domestic-violence cases, and Fernandez has pointed to no evidence in the record to show how the trial court in his case should have concluded otherwise.  *Scugoza*, 949 S.W.2d at

---

[11]Although he does not analyze the case, Fernandez does cite *Gonzalez v. State* as an example of a case in which the court determined that testimony similar to Hensley's was not admissible.  No. 03-07-00323-CR, 2008 WL 2736889, at *5 (Tex. App.—Austin July 10, 2008, pet. ref'd) (mem. op., not designated for publication). But Fernandez's reliance on *Gonzalez* is misplaced.  There, the victim did not display the "typical" behavior of an abused spouse.  *Id.*  Testimony about the cycle of violence, therefore, did not assist the jury in understanding the victim's actions or rebut a defensive theory.  *Id.*  Further, the testimony unduly prejudiced the defendant by suggesting to the jury that he had abused the victim in the past.  *Id.*  Here, evidence of Fernandez's past abuse was admitted into evidence, and the theories relied upon by Hensley explained why Leza may have remained in communication with Fernandez even though she feared him and did not want to have any contact with him.

16

363 (holding that expert's testimony comparing reaction of complaining child with general behavioral characteristics of abused children helped jury in determining whether assault occurred); *Fielder*, 756 S.W.2d at 321 (holding same as to female victims of domestic violence). This factor favors the trial court's admitting Hensley's testimony.

As to the second factor, the State had a relatively strong need for this evidence because Fernandez's main defense was that because Leza had repeatedly opened lines of communication with Fernandez, she could not possibly have been placed in fear by his actions. Hensley's testimony about how victims of both domestic violence and stalking often open lines of communication or agree to meet with their abusers was a direct rebuttal to Fernandez's theory that Leza's continued, purposeful interactions with Fernandez showed that she had not been placed in fear by his actions. This factor weighs heavily in favor of the trial court's admitting Hensley's testimony.

As to the third factor, the evidence in question had limited potential to cause unfair prejudice. Unfair prejudice may be created by the tendency of the evidence to prove some adverse fact not properly in issue or to unfairly excite emotions against the defendant. *Montgomery v. State*, 810 S.W.2d 372, 392 (Tex. Crim. App. 1990). But here, Hensley's testimony did not tend to prove some adverse fact; rather, her testimony was about the behaviors of domestic-violence and stalking victims in general and was predicated on theories that have consistently been allowed into

evidence in cases like this one. *Scugoza*, 949 S.W.2d at 363; *Fielder*, 756 S.W.2d at 321. This factor favors the trial court's admitting Hensley's testimony.

The remaining factors add no weight to the scales. As to the fourth and fifth factors, we do not perceive any way in which the evidence would have confused or distracted the jury, and the evidence was not of such scientific or technical character that it might have been given undue weight by an untrained jury. *See Gigliobianco*, 210 S.W.3d at 641. Finally, as to the sixth factor, the trial court could have reasonably concluded that the presentation of Hensley's testimony would not consume an inordinate amount of time. *See id.* at 641–42. In fact, Hensley's testimony comprised less than one-eighth of the testimony in the State's case in chief (41 record pages out of 593 total pages for the State's case). We do not believe that this amount of time was excessive. *See Warren v. State*, No. 02-19-00023-CR, 2019 WL 4124377, at *5 (Tex. App.—Fort Worth Aug. 29, 2019, no pet.) (mem. op., not designated for publication) (holding that expert's testimony on domestic violence in general did not consume an inordinate amount of time given testimony constituted only 21 record pages out of 170 total pages for the State's case and thus neither weighed in favor nor against admission of the testimony under Rule 403). These remaining factors weigh neutrally.

Three factors weigh in favor of admission, one of them heavily so. The remaining factors weigh neutrally. We therefore conclude that the trial court did not

18

exceed the "considerable freedom" it is afforded in exercising its discretion under Rule 403. *See Montgomery*, 810 S.W.2d at 378. We overrule Fernandez's second point.

## C. Fernandez's Claims that the Stalking Statute is Unconstitutional

In his third and fourth points, which Fernandez brings up for the first time in his reply brief, he argues that because this court has held that an element of the harassment statute is unconstitutionally vague and because the stalking statute incorporates by reference the harassment statute, then the jury's verdict was not founded on a constitutionally valid statute, and this case demands a remand. The State argues that Fernandez has failed to preserve these points for our review. We agree with the State.

After Fernandez filed his opening brief, this court, in *Ex parte Barton*, declared the electronic-communication element of the harassment statute facially unconstitutional. 586 S.W.3d 573, 585 (Tex. App.—Fort Worth 2019, pet. granted) (op. on reh'g). Based upon *Barton* and the reference to the harassment statute in the stalking statute, Fernandez raises a facial challenge to the constitutionality of the stalking statute for the first time on direct appeal.

Generally, a facial challenge to the constitutionality of a statute may not be raised for the first time on appeal. *Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009). Failure to raise a facial challenge in the trial court may forfeit it on appeal. *Id.* One exception to the general rule is when the statute under which an appellant has been convicted is adjudged facially unconstitutional during the pendency

19

of his appeal—then he may raise a facial challenge first on appeal. *Smith v. State*, 463 S.W.3d 890, 895–97 (Tex. Crim. App. 2015). Because an unconstitutional statute is void from inception, a challenge to a conviction under that statute is neither waived nor forfeited when presented post-conviction. *Id.* at 895; *Ex parte Beck*, 541 S.W.3d 846, 855 (Tex. Crim. App. 2017).

Here, Fernandez did not challenge the facial constitutionality of the stalking statute in the trial court. His claim, therefore, is forfeited unless binding authority has adjudged the stalking statute facially unconstitutional and the *Smith* exception to preservation applies. *Smith*, 463 S.W.3d at 896; *Beck*, 541 S.W.3d at 855.

No court has declared the stalking statute under which Fernandez has been convicted facially unconstitutional. *See* Tex. Penal Code Ann. § 42.072. Rather, multiple courts, including this court, have upheld the constitutionality of prior versions of the stalking statute. *See Ploeger v. State*, 189 S.W.3d 799, 812–15 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *State v. Seibert*, 156 S.W.3d 32, 37 (Tex. App.—Dallas 2004, no pet.); *Lewis v. State*, 88 S.W.3d 383, 392 (Tex. App.—Fort Worth 2002, pet. ref'd); *Sisk v. State*, 74 S.W.3d 893, 902 (Tex. App.—Fort Worth 2002, no pet.); *Battles v. State*, 45 S.W.3d 694, 703 (Tex. App.—Tyler 2001, no pet.); *Clements v. State*, 19 S.W.3d 442, 451 (Tex. App.—Houston [1st Dist.] 2000, no pet.). Thus, the *Smith* exception does not enable Fernandez to raise a first-time facial challenge on direct appeal based upon binding authority directly striking down the stalking statute. But Fernandez's challenge may still be brought for the first time on

20

appeal under the *Smith* exception unless the statute that he was convicted under is materially different than the portion of the harassment statute that this court has held unconstitutional. *Beck*, 541 S.W.3d at 858.

Fernandez claims that the electronic-communications section of the harassment statute is "sufficiently similar" to the stalking statute and thus it triggers the *Smith* exception. We disagree.

A side-by-side comparison between the stalking statute that Fernandez was convicted of and the harassment statute that this court held unconstitutionally overbroad in *Barton* shows that the statutes are materially different:

| Elements of Stalking | Elements of Harassment |
|---|---|
| 1. A person | 1. A person |
| 2. on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person | 2. (Statute has no equivalent.) |
| 3. knowingly engages in conduct that | 3. with intent to harass, annoy, alarm, abuse, torment, or embarrass another |
| 4. constitutes an offense under Section 42.07, or that the actor knows or reasonably should know the other person will regard as threatening: (A) bodily injury or death for the other person; (B) bodily injury or death for a member of the other person's family or household or for an individual with whom the other person has a dating relationship; or (C) that an offense will be | 4. sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another. |

| | |
|---|---|
| committed against the other person's property; | |
| 5. causes the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship to be placed in fear of bodily injury or death or in fear that an offense will be committed against the other person's property, or to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; | 5. (Statute has no relationship requirement.) |
| 6. would cause a reasonable person to:<br>(A) fear bodily injury or death for himself or herself;<br>(B) fear bodily injury or death for a member of the person's family or household or for an individual with whom the person has a dating relationship;<br>(C) fear that an offense will be committed against the person's property; or<br>(D) feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended. | 6. (Statute has no reasonable person requirement.) |

Tex. Penal Code Ann. §§ 42.07(a)(7); 42.072.

As the State points out, and as can be seen by the comparison of the two statutes, "[t]he stalking statute is materially different than the electronic-communications section of the harassment statute." Thus, the *Smith* exception does not apply to this case.

Relying on the Texas Court of Criminal Appeals' decision in *Beck*, Fernandez also seems to argue that because the stalking statute incorporates the electronic-communications section of the harassment statute that this court held unconstitutional in *Barton*, and even if this court compares the stalking statute with the harassment statute, "the stalking statute is sufficiently similar to the one in *Barton* for the *Smith* exception to apply." 541 S.W.3d at 858. Fernandez's reliance on *Beck*, however, is misplaced. In *Beck*, the court did precisely what this court has already done in this case. *See id.* That is, the *Beck* court engaged in a side-by-side comparison of the improper-relationship statute at issue in that case with the online-solicitation statute that had been declared unconstitutional. *Id.* The *Beck* court concluded that even though the improper-relationship statute referred to the online-solicitation statute, the statutes were materially different because the improper-relationship statute "contains the additional elements that the actor be a school employee and that the recipient of the sexually explicit communications be a student." *Id.* That same reasoning applies to the statutes at issue in this case.

Although the stalking statute refers to the harassment statute, it contains the additional elements that the victim has a familial or dating relationship with the offender and that the offender engaged in conduct placing the victim in fear of bodily injury or death. Thus, like in *Beck*, the stalking statute applies in a much narrower context than the harassment statute. *See id.* ("The improper-relationship statute thus applies in a much narrower context than did the former online-solicitation provision,

23

which applied broadly to any sexually explicit communications between an adult and a minor.").

Because there is no binding authority declaring the stalking statute unconstitutional and because the stalking statute is materially different from the section of the harassment statute that this court has declared unconstitutional, the *Smith* exception does not apply; thus, Fernandez's first-time facial constitutional challenge to the stalking statute falls under the general rule that provides such complaints may not be raised for the first time on appeal. *See Beck*, 541 S.W.3d at 855; *Smith*, 463 S.W.3d at 895–97; *Karenev*, 281 S.W.3d at 434. Accordingly, because Fernandez forfeited his third and fourth points for appellate review, we overrule them.

## IV. CONCLUSION

Having overruled all four of Fernandez's points on appeal, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: March 5, 2020

24